[No. 22283. Department One. October 28, 1930.]

ELLA M. ARSNOW, *as Administratrix, Respondent and Cross-Appellant,* v. RED TOP CAB COMPANY, *Appellant.*[1]

[1]Reported in 292 Pac. 436.

138

*Shank, Belt & Fairbrook,* for appellant.

*John F. Dore, T. M. Royce,* and *Jacob Kalina,* for respondent.

BEALS, J.—The late Harvey J. Arsnow, May 21, 1927, was, at the intersection of Second avenue and Yesler Way in the city of Seattle, struck and severely injured by a taxicab operated by defendant Red Top Cab Company. Mr. Arsnow sued defendant for damages for his injuries, alleging in his complaint that the collision between himself and the taxicab was due to the negligence of defendant's driver; and upon the issues being made up, the action was tried to a jury, a mistrial resulting, the jury having been unable to agree.

Three days after the trial, Mr. Arsnow committed suicide by shooting himself through the head with a pistol, and thereupon plaintiff, his widow, having been appointed administratrix of her husband's estate, and substituted as plaintiff herein, filed an amended com-

plaint setting forth two causes of action; one based upon the pain and suffering sustained by Mr. Arsnow prior to his death; the second alleging Mr. Arsnow's age, life expectancy, and earning capacity, and that, as a result of the injuries received by him at the time he was struck by defendant's taxicab, his brain was injured and he was thereby rendered insane, and that, while insane as a result of such injuries, he inflicted a mortal wound upon himself, from which wound he died.

Plaintiff asked judgment for the sum of fifty thousand dollars upon each of the two causes of action set forth in her complaint. The cause was tried to a jury, which returned a verdict in plaintiff's favor on the first cause of action in the sum of five thousand dollars, and, upon the second cause of action, a verdict in her favor in the sum of fifteen thousand dollars.

Defendant moved for judgment in its favor notwithstanding the verdict, or, in the alternative, for a new trial, as to the first cause of action, which motions were overruled; and also moved for judgment in its favor notwithstanding the verdict upon the second cause of action, which motion was granted. Judgment was thereupon entered in favor of plaintiff on the first cause of action for the sum of five thousand dollars, and in defendant's favor, notwithstanding the verdict, upon the second cause of action. Defendant appeals from the judgment rendered against it for the sum of five thousand dollars, and plaintiff cross-appeals from the judgment in defendant's favor upon the order granting defendant's motion for judgment in its favor notwithstanding the verdict rendered upon the second cause of action. To avoid confusion, the parties will, in this opinion, be referred to as plaintiff and defendant.

Defendant assigns error upon the reading to the jury of a transcript of the testimony of Mr.

Arsnow given upon the former trial of the action. This testimony was offered by plaintiff under Rem. Comp. Stat., § 1247, which reads as follows:

"The testimony of any witness, deceased, or out of the state, or for any other sufficient cause unable to appear and testify, given in a former action or proceeding, or in a former trial of the same cause or proceeding when reported by a stenographer, or reduced to writing, and certified by the trial judge, upon three days' notice to the opposite party or parties, together with service of a copy of the testimony proposed to be used may be given in evidence in the trial of any civil action or proceeding, where it is between the same parties and relates to the same matter."

Defendant argues that, as plaintiff, in both the causes of action stated in her amended complaint, alleged that, as a result of the accident, Mr. Arsnow became insane and suffered from loss of memory, his testimony as given upon the first trial, prior to which no question as to Mr. Arsnow's sanity had been suggested by anyone, was incompetent upon the second trial under Rem. Comp. Stat., § 1213, which enumerates, among the classes of persons not competent to testify, "those who are of unsound mind." Defendant admits that, under certain circumstances, persons suffering from some kinds and degrees of mental disability are competent witnesses, this matter being fully discussed in 32 C. J. 593-625, but defendant argues that, under the record in this case, and in view of the testimony of plaintiff herself, the trial court committed error in permitting the testimony given by Mr. Arsnow on the former trial to be read to the jury upon the second trial.

Plaintiff testified, as disclosed by the record now before us, in regard to her husband's mental condition, as follows:

"Q. After this collision tell the jury in your own

way how your husband acted, in what way your husband acted differently than he did before the injury?
A. Well, it affected his memory. Before the accident he had a very good memory, and after the accident, why, it was affected awful. When he went to the store or down the street he did not know where he was going, and when he came back he could not explain where he had been, and writing or 'phone calls he could not remember anything. If he tried to call somebody he could not remember who he called or who he wanted to call. Q. What about his going to the store for food articles? A. He would not remember what he was going for. He would come back without what I sent him for, and he would be three or four hours, just half a block. Q. Would he know where he had been? A. No, sir, he could not explain where he had been. Q. What about ordering groceries, would he know where he had ordered them? A. No, sir, he would not. Q. Can you tell the jury of any specific instances of that? A. Yes, sir. One time he went and ordered $8.00 worth of groceries and could not explain where he ordered it. He did not know where he ordered it. He ordered some kinds of canned goods that we never used. . . . Q. I will ask you if in your opinion after this collision down to the time of his death he was insane? . . . A. He was insane. . . . Q. I will ask you if in your opinion after this collision down to the time of his death he was insane? A. Certainly, he was insane. Q. What is your opinion on the matter? A. He was insane.''

In addition to her own testimony, plaintiff produced as witnesses two physicians, who testified positively that Mr. Arsnow was insane. Referring to Mr. Arsnow's condition on December 13, 1927 (the date of the first trial), one of these physicians, on cross-examination, testified:

''Q. Was he insane on the day he testified? A. He was. Q. That is the testimony of an insane man? A. Yes, sir.''

Other testimony to the same effect was introduced

by plaintiff, who now strenuously contends that Mr. Arsnow was insane at the time he testified on the first trial.

Defendant introduced as witnesses on its behalf two physicians, who testified that they had examined the transcript of Mr. Arsnow's testimony, and that they found no evidence of insanity in the answers given by Mr. Arsnow to the questions propounded to him, as set forth in such transcript, the answers appearing to be perfectly normal. We do not regard the testimony of defendant's medical witnesses as controlling. They were never acquainted with Mr. Arsnow, and simply read his testimony, from which they testified that no insanity appeared from the answers made by Mr. Arsnow to the questions propounded to him. Plaintiff's medical witnesses, on the other hand, testified that they had known Mr. Arsnow during his lifetime, had either attended or examined him professionally, and that he was insane on the date of the first trial. Plaintiff contends that such testimony as is now in question is not open to attack, when offered upon a second trial, unless the objection was made at the time the witness was on the stand giving his testimony. In support of this contention, plaintiff cites the case of *Scribner v. Palmer,* 90 Wash. 595, 156 Pac. 531.

In the case cited, it was held that the testimony of the original plaintiff in the action, who had died subsequent to a first trial thereof, was properly admitted in evidence at the second trial. Certain questions were discussed which are not relevant here, it being sufficient to say that it was evident that the questions presented fell squarely within the terms of the statute.

Physicians who testified on behalf of plaintiff at the second trial, stated that, at the time of the first trial, they knew Mr. Arsnow's mental condition, and that he

was then insane. Notwithstanding this state of facts, no effort was made to have a guardian or a guardian *ad litem* appointed for Mr. Arsnow, but he was permitted to prosecute the action in his own name, as a person in all respects *compos mentis*. Now that a different situation is presented, and this plaintiff has become the beneficiary of any claim which may be predicated upon the accident and resulting injuries to Mr. Arsnow, she alleges that her late husband was insane and mentally incompetent at all times after the accident, and specifically at the time of the first trial.

In support of her contention that Mr. Arsnow's testimony on the first trial was properly read on the second trial, plaintiff cites cases in which witnesses who were under restraint on account of supposed mental disability, were permitted to testify in court proceedings. These authorities are not in point, as, in those cases, all parties at the time the testimony was given were apparently advised as to the existing situation, and could examine or cross-examine each witness fully for the purpose of testing his mental capacity, memory, judgment, or prejudice.

It is true that, in his original complaint, Mr. Arsnow alleged that he had suffered a concussion of the brain, and, as a result thereof, was afflicted with amnesia, and that his injuries were progressive. This, however, is far from an allegation that he was insane, and on the first trial Mr. Arsnow testified as a witness on his own behalf without, as far as appears here, the matter of his possible insanity having been suggested. On the second trial, plaintiff, as her husband's legal representative, affirmatively alleged his insanity, and offered considerable evidence in an attempt to prove that he was insane. Plaintiff at the same time offered Mr. Arsnow's testimony on the former trial, as tending to

prove facts necessary to support a verdict in her favor.

This situation is entirely different from one in which a person known to be under restraint because of mental deficiency, is offered as a witness and may be subjected to full and complete examination and cross-examination, from which the court or jury may, after being fully advised as to all the circumstances, determine the degree of credibility to be accorded to the testimony given. Plaintiff in her testimony lays great stress upon her husband's inability to remember even simple matters connected with his everyday life. The two physicians who testified on behalf of plaintiff stated positively that Mr. Arsnow was insane, and testified fully as to the reasons for their belief. They testified that they knew Mr. Arsnow was insane at the time he testified on the first trial, one of the witnesses testifying that he then informed the court that Mr. Arsnow should, for his own protection, be placed under restraint. The fundamental inconsistency in plaintiff's position in alleging Mr. Arsnow's insanity, and at the same time relying upon his former testimony to prove facts which she deemed important parts of her case, takes this situation without the rule of the statute above quoted.

It is also manifest that, as to her second cause of action, the testimony of Mr. Arsnow on the first trial was inadmissible, because, as to that cause of action, this suit is not waged between the same parties. While it is true that plaintiff is now prosecuting this litigation as administratrix of the estate of her late husband, and that her first cause of action might well be held to be a continuation of the original suit, her second cause of action never was his, but is hers alone, being based upon the fact of her husband's death. Under no theory, therefore, could Mr. Arsnow's testimony be

held admissible in support of plaintiff's second cause of action.

Under the circumstances disclosed by this record, it must be held that the trial court erred in permitting Mr. Arsnow's testimony to be read to the jury.

Another question is presented which goes to the merits of the entire controversy. The following sections of the statute refer to the maintenance of an action for damages for injuries which have caused the death of a human being:

"When the death of a person is caused by the wrongful act, neglect or default of another his personal representative may maintain an action for damages against the person causing the death; and although the death shall have been caused under such circumstances as amount, in law, to a felony." Rem. Comp. Stat., § 183.

"Every such action shall be for the benefit of the wife, husband, child or children of the person whose death shall have been so caused. If there be no wife or husband or child or children, such action may be maintained for the benefit of the parents, sisters or minor brothers, who may be dependent upon the deceased person for support, and who are resident within the United States at the time of his death. In every such action the jury may give such damages as, under all circumstances of the case, may to them seem just." Rem. Comp. Stat., § 183-1.

"No action for a personal injury to any person occasioning his death shall abate, nor shall such right of action determine, by reason of such death, if he have a wife or child living, or leaving no wife or issue, if he have dependent upon him for support and resident within the United States at the time of his death, parents, sisters or minor brothers; but such action may be prosecuted, or commenced and prosecuted, by the executor or administrator of the deceased, in favor of such wife, or in favor of the wife and children, or if no wife, in favor of such child or children, or if no wife or child or children, then in favor of his parents,

146

sisters or minor brothers who may be dependent upon him for support, and resident in the United States at the time of his death.'' Laws of 1927, p. 143, § 1; Rem. 1927 Sup., § 194.

Defendant contends that the injuries suffered by Mr. Arsnow as the result of being struck by the taxicab, did not occasion his death, and that therefore, upon Mr. Arsnow's suicide, this action abated and could not thereafter be maintained by plaintiff as his personal representative. Defendant argues that, under the authorities, a suicide committed under circumstances similar to those disclosed by this record, cannot be considered a proximate result of such physical injuries as were suffered by Mr. Arsnow, and that, unless it appears from the testimony that Mr. Arsnow, at the time he killed himself, was insane to such a degree that he did not know or appreciate the physical effect of the act of pulling the trigger of his pistol while the muzzle was pressed against his head, judgment herein must be in favor of the defendant. In other words, defendant urges that, unless it appears that the victim was, at the time of the suicide, so bereft of reason that he was unaware of the natural result of the act on his part which resulted in his death, the suicide cannot be held to be the proximate result of the injury.

Plaintiff testified that, on the morning of Mr. Arsnow's death, after making the bed, she placed his pistol (a Colt automatic) under his pillow, where he had been in the habit of keeping it, at which time Mr. Arsnow was sitting in a chair at the foot of the bed. Mrs. Arsnow then lay down and went to sleep. Defendant contends that, as Mr. Arsnow must have arisen from the chair upon which he was sitting, gone to the head of the bed and taken his pistol from under his pillow, released the safety catch, pressed the muzzle of the pistol against his head and pulled the trigger,

in the process releasing the second safety appliance in the handle of the pistol, he by these acts demonstrated that his suicide was deliberate, and that he had sufficient control of his mental faculties to know what he was doing, and deliberately put in operation a succession of physical acts which resulted in his voluntary death by his own hand.

In support of its contention that Mr. Arsnow had sufficient mentality to form a deliberate purpose to kill himself and to carry his plan into execution, and that therefore plaintiff in this action cannot recover, defendant cites several authorities which will now be referred to.

The supreme court of the United States, in the case of *Scheffer v. Railroad Co.,* 105 U. S. 249, held that the circuit court had properly sustained a demurrer to a complaint filed by the executors of Charles Scheffer, in which complaint it was alleged that Mr. Scheffer had been severely injured in a railroad accident, and that his injuries had resulted in a mental disease, which mental affliction caused Mr. Scheffer to take his own life. The circuit court sustained a demurrer to this complaint upon the ground, as stated by the supreme court,

". . . that the relation of such negligence was too remote as a cause of the death to justify recovery, the proximate cause being the suicide of the decedent, —his death by his own immediate act."

In affirming the judgment of the circuit court, the supreme court, after discussing two of its prior decisions, said:

"Bringing the case before us to the test of these principles, it presents no difficulty. The proximate cause of the death of Scheffer was his own act of self-destruction. It was within the rule in both these cases a new cause, and a sufficient cause of death.

"The argument is not sound which seeks to trace

this immediate cause of the death through the previous stages of mental aberration, physical suffering, and eight months' disease and medical treatment to the original accident on the railroad. Such a course of possible or even logical argument would lead back to that 'great first cause least understood,' in which the train of all causation ends.

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train.

"His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials, as his suicide, and each of these are casual or unexpected causes, intervening between the act which injured him, and his death."

In the case of *Brown v. American Steel & Wire Co.*, 43 Ind. App. 560, 88 N. E. 80, it appeared that the decedent had been employed as a helper in a nail factory, in the course of which employment he was severely injured, as a result of which his mind was affected and he finally committed suicide. The statutes of Indiana, in which jurisdiction the action was brought, provide that:

". . . when the death of one is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had he or she (as the case may be) lived, against the latter for the same act or omission."

It appeared that the deceased left his father's home, where he had been living, and went into a nearby cornfield, where he removed his coat and vest, and with his pocket knife severed his jugular vein, thereby causing his death. The court said:

"If the decedent at the time of taking his life had

mind enough to know what he wanted to do, and how to do it, the line of causation from the accident to the death would be broken by the act of suicide, and the latter would be the proximate cause of his death. From the cases bearing upon the subject now being considered the rule seems to be that an action under the statute may be maintained when the death is self-inflicted, only where it is the result of an uncontrollable influence, or is accomplished in delirium or frenzy, caused by the defendant's negligent act or omission, and without conscious volition of a purpose to take life; for then the act would be that of an irresponsible agent. . . . It is not enough to show negligence and the injury, but in addition appellant must also show that appellee's negligence proximately caused Cruse's death. The decedent's right to damages, had he lived, was a common-law right, limited to the damage sustained, attributable to the negligence of appellee. Appellant's right to recover, being statutory, depends upon whether her decedent could have maintained an action, had he lived, against appellee for a self-inflicted injury, as the active, operative, continuing, and the probable and natural sequence of the original injury. . . .

"Turning again to the record in this case, we find no evidence as to the decedent's strength of mind during a few weeks immediately prior to his death, but, assuming that his improved condition in that respect a few weeks before the day of the suicide continued, taken in connection with the agreed facts heretofore set out in this opinion, instead of showing a want of conscious volition, strongly indicates that the decedent had a mind capable of conceiving a purpose of taking his life, as well as a knowledge of the means which would certainly carry his purpose into effect. This conclusion from the evidence leaves an essential fact to support a verdict for plaintiff unsustained by the evidence; and, this being true, the trial court did not err in directing a verdict for the defendant."

It was held that no recovery could be allowed on behalf of the personal representative of the deceased.

The supreme court of Nebraska, in the case of *Long v. Omaha & C. B. St. R. Co.*, 108 Neb. 342, 187 N. W. 930, held that no recovery could be had in favor of the widow and children of one R. J. Long, who had been injured in a collision between the automobile in which he was riding and a street car, it being alleged that, as a result of the injuries which Mr. Long suffered, he was rendered insane, and that while insane he committed suicide. It seems that Mr. Long was severely injured August 6, 1918, and that, on the 23rd of the same month, he purchased a shell for a shotgun, saying that he wanted to try it in his gun, and a few moments later placed the shell in his gun and shot himself through the head. The court reviewed the authorities, commencing with the case of *Scheffer v. Railroad Co., supra,* and held that the trial court had properly rendered judgment in defendant's favor. In the course of its opinion, the court said:

"The extensive research which it is evident counsel for plaintiff made in the preparation of his briefs did not enable him to cite a single case brought under the statute of any state which gives a right of action for death by wrongful act, where plaintiff was permitted to recover damages resulting from the death of a party who committed suicide; nor has he cited any case wherein any court of last resort has disapproved or criticised the rule laid down by the United States supreme court in the Scheffer case, *supra,* and we have been unable to discover any such cases. On the contrary, said rule has been approved and adopted by the courts of several states. Therefore, notwithstanding the able and ingenious argument of plaintiff's counsel, we are constrained to hold that said rule is the correct one, and that it should be applied in the case at bar.

"It appears, from the petition and the opening statement of plaintiff's counsel, that Mr. Long, with deliberate purpose, planned to take his own life; that he went to a hardware store, procured a shell to fit a shotgun which he had; that he carried said shell to his

home, put it in the gun, and therewith shot and killed himself. All this points to his understanding of the physical nature and effect of his act, and to an intelligent and willful purpose to accomplish it. There is nothing to show that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act. This brings the instant case squarely within the rule announced in the Scheffer and kindred cases, *supra.* It therefore follows that the trial court did not err in sustaining defendant's demurrer and dismissing the case; and that the judgment of the district court is right, and should be and hereby is affirmed.''

In the case of *Daniels v. New York, N. H. & H. R. Co.*, 183 Mass. 393, 67 N. E. 424, 62 L. R. A. 751, the supreme court of Massachusetts, in considering a case based upon a suicide, which, it was alleged, had been committed while the deceased was insane, the insanity having been brought on by injuries suffered by him due to the negligence of the defendant, said:

''We are thus brought to the consideration of the question—which is often very difficult to decide—whether an essential condition precedent is the active, efficient, proximate cause of a subsequent event, or is only a producer of conditions which open the door to another cause which directly and actively produces the result. Was death in this case a remote consequence of the collision, or was it an effect actively produced by it? . . . In the present case the question is, what is meant by the language of the statute in reference to a death that occurs a long time after the collision, from direct causes which come into existence and take form after the lapse of weeks or months or possibly years, although they may be traced back to the collision as a first cause? In interpreting the present statute in reference to such facts, the question is not exactly whether the insane person who takes his life dies by his own hand or commits suicide. It is whether the act of volition—the willful, deliberate purpose to take his life, when put in execution—is to be treated

as an independent, direct, and proximate cause of the death, notwithstanding that he was so far insane as to be unable fully to comprehend the moral quality of his act. In a condition such as is here supposed, the injury has caused mental disease which has weakened the forces that hold one in check and restrain him from acts of violence, and that enable him to appreciate the reasons for not interfering with the natural laws of his being. Very likely the disease also causes him extreme suffering, and deprives him of the pleasures of life, and thus exposes him to great temptation, from which he would be free if in good health. In this weakened and wretched condition, lacking a sound mind to guide him morally, but still having powers which enable him to know what he thinks he wants to do and how to do it, by an act of volition he chooses to die, and thereupon takes his own life. It may be said that he is forced to the deed by his disordered faculties. Some contend that we are all slaves of destiny. Our subject brings us near to the vexed theological problem as to free will and predestination. Without attempting to pursue these inquiries too far, we are of opinion that the voluntary, willful act of suicide of an insane person, whose insanity was caused by a railroad accident, and who knows the purpose and the physical effect of his act, is such a new and independent agency as does not come within and complete a line of causation from the accident to the death.

"Suppose, under such conditions, one of an aggressive and irritable disposition should take the life of another person, when, if his mind had not been weakened by the disease, he would have held himself in control; would it be said that the life of the other was lost by the collision on the railroad? . . .

"We are satisfied with the conclusions reached in *Dean v. American Insurance Co.,* 4 Allen 96, and *Cooper v. Massachusetts Mutual Life Insurance Co.,* 102 Mass. 227; and under this statute, involving different but similar considerations, we are of opinion that the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or

frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues. . . .

"The burden of proof was on the plaintiff to show that the death was caused by the collision. All the evidence tended to show that the deceased, with deliberate purpose, planned to take his own life; that he closed the door, and locked it, with a view to exclude others and prevent interruption; and that he then took the napkin, and used it effectively to strangle himself. All this points to an understanding of the physical nature and effect of his act, and to a willful and intelligent purpose to accomplish it. That he was insane, so as to be free from moral responsibility, is not enough to make the defendant liable. We are unable to discover any evidence that he was acting without volition, under an uncontrollable impulse, or that he did not understand the physical nature of his act."

The last case cited was relied upon by the circuit court of appeals for the second circuit in the case of *Salsedo v. Palmer*, 278 Fed. 92, 23 A. L. R. 1262, in which that court held that the district court had correctly sustained demurrers to a complaint brought by a widow, as administratrix of the estate of her deceased husband, her complaint alleging that the defendants had wrongfully arrested the deceased and assaulted him, inflicting upon him grievous bodily injuries; that, as a result of this conduct, the decedent became insane, and, while mentally irresponsible, threw himself from a window, as a result of which he died. The defendants contended that the intervening and wrongful act of suicide was the proximate cause of the death, and that their own acts, the demurrer admitting that they were committed as alleged in the complaint,

were not sufficient to make them responsible for the injury which resulted, but were in law too remote to constitute any basis for an action against them, based upon the death of the man it was alleged they assaulted. The court held that the complaint stated no cause of action, and that demurrers had been properly sustained thereto. The court says:

"In *Daniels v. New York, N. H. & H. R. Co.*, 183 Mass. 393, 62 L. R. A. 751, 67 N. E. 424, the action was brought under the Massachusetts statute to recover from the railroad company for negligently causing the death of one Daniels, who was injured in a collision at a railroad crossing. It appears that he had received a blow on the head and other injuries in the collision, and that these injuries caused mental disease, with the result that he committed suicide. It was held the railroad company was not liable. The court declared that the liability of a defendant for a death by suicide—'exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act. An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues.' It declared its opinion to be 'that the voluntary, wilful act of suicide of an insane person, whose insanity was caused by a railroad accident, and who knows the purpose and the physical effect of his act, is such a new and independent agency as does not come within and complete a line of causation from the accident to the death.'

"We think it unnecessary to examine into the cases further. In our opinion the allegations of the complaint are insufficient to sustain a cause of action against the defendants for causing the death of the unfortunate decedent. His death was not the natural or probable consequence of what the defendants are alleged to have done, and the connection between the de-

fendant's original acts and the final result was too remote.

"If the deceased, his mind having become unbalanced because of the treatment to which the defendants subjected him, had escaped from his confinement, and, being unable to appreciate the wrongfulness of his act, had killed the first man he met, could it be said that the death was due to the acts of the defendants? We feel certain that no liability would attach to them under such circumstances. And we feel equally certain that in taking his own life, instead of that of another, the responsibility of defendants is no different."

Plaintiff relies upon the case of *In re Sponatski*, 220 Mass. 526, 108 N. E. 466, L. R. A. 1916A 333, in which the widow of a deceased workman was allowed compensation under the workmen's compensation act of Massachusetts, her husband having died under the following circumstances: He had, in the course of his employment, received a most painful injury, molten lead having been splashed into his eye. Approximately a month later, he, as found by the industrial accident board, "while insane as a result of his injury threw himself from a window and was fatally injured." The board also found that the insanity resulted from the injury, and that the death "did result from an uncontrollable impulse and without conscious volition to produce death." In reviewing the award, the supreme judicial court of Massachusetts said (the reference being to a note written by the decedent just before he killed himself):

"Aside from this there was no evidence tending to show that he had contemplated suicide or that the jumping from the window was the exercise of even a 'moderately intelligent power of choice.'

"The letter does not seem to us necessarily indicative of a suicidal purpose. It was not signed by the name of the deceased, which was Charles J. Sponatski. It apparently was wholly the product of a disordered

intellect. It is as consistent with some other phantom of an unbalanced imagination as it is with a volition to end his life. The circumstances of the leap from the window as narrated by all the eyewitnesses point rather to ungovernable lunacy than to the volition even of a diseased mind. The finding in this respect, although hanging on a rather slender thread of evidence, is not unsupported. Therefore it must stand.''

The court refers to its prior decision in the case of *Daniels v. New York, N. H & H. R. Co., supra*, but held that under the facts a different rule should apply, and that the award in favor of the widow should be affirmed. It does not appear that the court in any way modified its rule as laid down in the *Daniels* case, but simply held that a different state of facts called for a different result, and that the widow was entitled to receive an award under the law providing for compensation to injured workmen and their dependents.

Plaintiff contends that, in the case at bar, there is a conflict in the testimony as to whether Mr. Arsnow took his life of his own free will while sane, or whether he took it while insane as a result of an uncontrollable impulse. In such cases as this, liability may exist on the part of a person, situated as is defendant here, where the death of the person injured results from his own act committed in delirium or frenzy, and without consciousness or appreciation on his part of the fact that such act will, in all reasonable probability, result in his death, or when the act causing the death is the result of an uncontrollable impulse, resulting from a mental condition caused by the injuries. It is not contended here that Mr. Arsnow's death occurred in delirium or frenzy, but it is contended that he was induced to shoot himself by an uncontrollable impulse arising from his insanity, which, in its turn, was caused by the accident. It appears from the testimony that Mr. Arsnow had often threatened to shoot himself, that

he had told his physician that he feared he would be impelled to that act, that he kept by him the pistol with which he finally shot himself, and often stated to his wife that he would kill himself with it. We do not understand that it is contended that this testimony was contradicted, but, of course, the same was subject to different constructions, plaintiff arguing that the evidence supports the finding of the jury that Mr. Arsnow was led to kill himself while insane by an uncontrollable impulse which he had not the power to resist.

Plaintiff cites two decisions of this court. In the first, *Knapp v. Order of Pendo,* 36 Wash. 601, 79 Pac. 209, a recovery was allowed upon a mutual benefit certificate issued to David Knapp, the certificate providing that, in the event of the death by suicide, during the first year of membership, of the member to whom the same was issued, the beneficiary therein named should not be entitled to receive any benefits thereunder. To a complaint alleging the issuance of the certificate and the death of the member named therein, an answer was filed, alleging that Mr. Knapp's death was caused within the limited period by his own voluntary, willful and unlawful act. In her reply, this allegation was denied, and it was alleged that, if Mr. Knapp's death was caused by his own act, such act was not voluntary or willful, but was the result of insanity and mental derangement. The trial court instructed the jury that:

"If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy, or desire to escape from the ills of life, intentionally takes his own life, the proviso attaches and there can be no recovery. If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about

to commit, or when he is impelled thereto by an insane impulse which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the defendant is liable."

This instruction was held to be the proper statement of the law. The case cited presented a question as to the construction of a contract of life insurance, based upon a valuable consideration, voluntarily entered into between the parties, the basis of the action being thus fundamentally different from that upon which the case at bar is founded. Many cases may be found in which the provisions of life insurance policies have been construed in connection with the subsequent suicide of the insured, but such cases are not directly in point in considering questions which arise in the trial of actions for personal injuries. We do not find that the case last cited is controlling upon any of the questions here presented.

Plaintiff also cites the case of *Hepner v. Department of Labor and Industries,* 141 Wash. 55, 250 Pac. 461, in which this court affirmed a judgment entered upon the verdict of a jury in favor of the widow of a deceased workman, who, it appeared, had suffered an injury to his knee in the course of his employment, which injury, it was contended, had resulted in his insanity, it being further alleged that, while insane, the deceased had walked into a moving train, suffering injuries, as a result of which he died. The plaintiff in her complaint alleged that the decedent, while insane, wandered upon the railroad track, was struck by the train and killed. The defendant contended that the deceased either met his death through negligence, or that he intentionally threw himself in the way of the moving train. In the course of the opinion, this court says:

"The evidence was all but conclusive that decedent

was insane; and, from the testimony given by medical experts, it was shown that his state of mind was that of a child. If his mind was in the condition shown by the evidence, it is, of course, apparent that he could not commit suicide, as that term is usually used to indicate the action of a person who is able to weigh and appreciate the thing about to be done; or, as was said in *Case of Sponatski,* 220 Mass. 526, 108 N. E. 466, L. R. A. 1916A 333:

"' . . . a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act . . .'

"Nor was there any evidence in the record to indicate that decedent was walking upon the track for exercise, or that he went there for the purpose of piling bark."

It held that the evidence justified a finding by the jury to the effect that the deceased met his death from wandering on the railroad track while in an insane condition, and that the insanity resulted from the injury suffered by the workman in the course of his employment. It does not appear that in the case cited there was evidence that the decedent, either moved by an uncontrollable impulse or by a conscious determination, intended to be struck by the train. In the case at bar, it conclusively appears that Mr. Arsnow often threatened to shoot himself, and that he finally accomplished his death by the very method which he had so often threatened to employ to that end. It is also evident that, in shooting himself, Mr. Arsnow used both reason and knowledge gained by experience, and that his mind was, to some extent at least, functioning and able to direct his hand in performing physical acts necessary to produce the desired result.

In the early case of *Swanson v. Pacific Shipping Co.,* 60 Wash. 87, 110 Pac. 795, this court said, referring to a situation somewhat similar to that here presented:

"It seems to us that this section [§ 194, Rem. & Bal. Code, being the same section of Rem. Comp. Stat., and, so far as the particular question then being considered is concerned, similar to the act of 1927 above quoted] is not susceptible of construction. If under its provisions the wife and children could not be substituted as parties plaintiff, and continue the prosecution of the action, it would necessarily abate, contrary to the direct prohibition of the section itself. In order that the prosecution of the same action might be continued by the wife and children, it was necessary for them to allege, and afterwards prove, that the identical injuries for which Gust Swanson had sued caused his death. In other words, if his death resulted from any other cause, or did not result from such personal injuries, the action would abate. The respondents, therefore, alleged and introduced evidence to show that his death was occasioned solely by the injuries for which he had sued. They did so, not to sustain any claim for damages resulting from his death, but to show facts which became a necessary condition precedent to their continuance and prosecution of the action."

The case of *Whiting v. Seattle,* 144 Wash. 668, 258 Pac. 824, is also in point in connection with this question.

The jury in this action by its verdicts found that Mr. Arsnow was insane at the time he killed himself. This brings before us squarely the proposition as to whether or not, under the circumstances disclosed by this record, defendant is liable to plaintiff as surviving spouse of the decedent for Mr. Arsnow's death. The rule that one who negligently injures another is not liable to one in plaintiff's situation, under the circumstances now before us, may seem harsh, but, if the law were otherwise, a logical extension of the rule would lead to many difficulties.

As suggested in some of the cases cited, if a person who has been injured through the negligence of another, and because of such injury suffered a degree of

mental deterioration, may by his suicide render the person who injured him liable in damages to the surviving husband, wife or child of the deceased, could not a person bearing such relation to one whom the mentally afflicted person might kill, also hold the tort feasor in damages?

And again, if the injured person should attack and injure another, or injure him negligently, could the injured person, in such case, hold the person whose original negligence might be supposed to have caused the first person hurt to have become mentally deficient? Suppose that, in the case at bar, Mr. Arsnow had simply injured himself, instead of committing suicide, or suppose he had, while driving an automobile, injured a third person, could defendant be held liable for damages on account of such a situation?

The doctrine of proximate cause is well established in our system of jurisprudence, and is a salutary and, indeed, a necessary rule. It seems to us clear that the defendant herein can only be held liable to plaintiff by an extension of the rule applicable to such cases, and we do not feel that the law, as it now stands, should be so extended.

Following the authorities above referred to, we hold that, from the undisputed testimony contained in the record before us, it must be determined, as matter of law, that plaintiff failed to produce evidence which can support a finding of the jury in her favor to the effect that her deceased husband, at the time he killed himself, was laboring under such mental disability as can be denominated frenzy, and was therefore entirely ignorant of the natural consequence of his act in pulling the trigger of his pistol while the muzzle was pressed to his head, or, on the other hand, that, in so shooting himself, he was moved by an uncontrollable

162

impulse, within the rule laid down by the authorities above referred to. We conclude that the death of Mr. Arsnow cannot be held to have been the proximate result of the injuries which he suffered at the time of the collision with defendant's taxicab, and that no right of action now exists in plaintiff's favor upon which she may recover judgment against defendant.

The judgment of the trial court is affirmed on plaintiff's cross-appeal, and on defendant's appeal is reversed, with instructions to enter judgment in defendant's favor.

MITCHELL, C. J., PARKER, TOLMAN, and MILLARD, JJ., concur.

[1]Reported in 292 Pac. 445.