[No. 360-41053-1.    Division One—Panel 2.    January 4, 1971.]

JEROME B. HUNT, *Respondent,* v. KING COUNTY, *Appellant.*

*Williams, Lanza, Kastner & Gibbs* and *Joseph J. Lanza,* for appellant.

*Kumm, Maxwell, Petersen & Lee* and *Raymond J. Petersen,* for respondent.

HOROWITZ, A. C. J.—Plaintiff, German B. Hunt, individually and as guardian ad litem for his minor son, Jerome B. Hunt, brought a negligence action against the defendant for damages resulting from defendant's failure to safeguard the minor son from self-inflicted injuries while a hospital patient. The case was tried to a jury. The trial court overruled defendant's challenge to the sufficiency of the evidence and defendant elected to stand on its challenge. Later, after verdict for plaintiffs, the court denied defendant's motion for judgment notwithstanding the verdict and for a new trial. Defendant appeals.

The facts viewed from the standpoint most favorable to the plaintiffs (*Holland v. Columbia Irrigation Dist.,* 75 Wn.2d 302, 450 P.2d 488 (1969)) are these:

Defendant operates a public hospital in Seattle, Washing-

ton known as the Harborview Hospital. The hospital contains a closed psychiatric ward on the fifth floor of the hospital building. The ward is operated for short term treatment of patients having acute psychiatric and emotional problems in varying degrees of seriousness pending the formulation of a planned approach for further care. In that connection, the hospital makes a preliminary diagnosis of a patient's propensity for escape, suicide or self-inflicted injuries, and takes precautions to prevent escapes by patients and resulting injuries therefrom.

The psychiatric ward is a self-contained unit accessible from the fifth floor lobby through a main door which is kept locked at all times. Access to the ward is had only through an attendant on duty. The ward has various rooms fronting on a hallway going down the middle of the ward. One of the rooms is the utility room here involved which contains a refrigerator, sink and cabinets for medical supplies. The doors to the patients' rooms are not generally locked but such rooms have metal screens on the windows in order to prevent outside access. Patients, unless restrained, are permitted to roam in and out of their rooms within the closed ward and thus have access to certain rooms with unlocked doors. Various rooms, including the utility room, have no screening on the windows so that outside access through the windows is possible. It is therefore necessary to keep the doors to such rooms locked. The door to the utility room is of the "Dutch" type in two sections with a counter superimposed on the lower half. Each section has a separate lock. There was a hospital rule requiring nurses, orderlies and the medical staff to keep the utility room door locked at all times. At times, hospital personnel neglected to keep the door to the utility room locked, but when the neglect was discovered efforts were made to enforce the rule.

About 2:50 a.m. on July 7, 1967, plaintiff Jerome, then approximately 20 years of age, was admitted to the hospital as a patient. He had been forcibly taken to the hospital by ambulance with police assistance and arrived with hand-

cuffs on his wrists and ankles, and a belt around his knees. At the time of his admission, the hospital was informed of much of his prior medical history, including the use of drugs and the events of the evening of July 6 which caused him to be taken to the hospital.

On the evening of July 6, Jerome's father first took Jerome to the University Hospital where in May and June of 1967 he had been previously treated for his drug problem over a period of 18 days. The hospital, however, had refused to admit the boy on the evening of July 6 because it was not equipped to handle him. The Harborview Hospital was recommended. The boy refused to go and returned to his parents' home. He was very angry. He locked himself in the basement of the home and demolished the basement contents with a pick. These actions caused him to be taken to the hospital in the manner described.

Dr. Wilson, assigned to the patient, received additional history from the father. The hospital chart notes that:

> Patient initially agreed to re-enter night of admission here after being hyperactive and irrational at home the same evening, but then ran away, returned home and tried to destroy house with a hatchet. Had to be subdued by police with tear gas and force. Father believes he may have been on Methedrine again, although he was never this belligerent in the past.

When the patient was admitted to the hospital, plaintiff father informed Dr. Wilson that he thought his son was taking amphetamines and that his son "was going to try every trick he could to get out of that hospital." Dr. Wilson assured plaintiff and his wife that the son would be "under lock and key and would remain that way until something was figured out." Defendant by its answer admitted that the son was accepted at the hospital "while he was suffering from emotional and mental disorder" and "during the period in which the plaintiff was in the psychiatric ward, he exhibited signs of a mentally disturbed person, requiring sedation therefor . . ."

After admission to the closed psychiatric ward of the hospital, a hospital chart was kept by nurses, orderlies and

hospital doctors concerning the patient's condition. They were required to keep currently familiar with the chart. The first entry showed that at the time Jerome was admitted he was "incoherent, dillusional [sic], hallucinating . . ." would "not answer questions" and was "threshing about making homicidal threats." It was noted that he had a history of amphetamine and withdrawal trips, and that he had been "[s]een by a psychiatrist in the past." He was sent to the psychiatric ward "agitated" and "in restraints." On July 7, at 5:30 a.m., one of the hospital doctors of the psychiatric service made the diagnosis of "acute schizophrenic break." Later that morning Dr. Wilson noted the previous hospitalization at University Hospital for amphetamine withdrawal, the multiple abrasions and lacerations, that he was not oriented to time and place, was "dulled," and his impression of "schizophrenic reaction, acute, undifferentiated."

There was evidence that during his stay, on one occasion, the patient had again been placed in restraint. The patient's condition apparently improved somewhat until we come to July 10. The last entry made prior to Jerome's escape was made by orderly Ward and stated that the patient was more cooperative, but "[s]till somewhat difficult to work with or get along with." Mr. Bell, a family friend, who visited the patient on July 10, was present immediately before the patient jumped and sustained his injuries. It was his impression that Jerome was dangerous and that he still lacked "the sensibilities you would consider normal. He had a look in his eyes that would scare you."

Mr. Bell testified that he and the patient walked together in the hall of the psychiatric ward and both reached the door leading to the utility room. He did not know that Jerome had earlier decided to escape through the utility room at the first opportunity. Mr. Bell had temporarily turned his back when suddenly the patient opened the door to the utility room, got out through the window of that room and jumped to the ground floor five stories below.

When Mr. Bell turned around and saw that the patient had gotten into the utility room he immediately called the orderly, Mr. Distad. Mr. Distad arrived too late to prevent the escape.

Following the fall, hospital personnel reached the patient on the ground. The evening supervisor noted on the patient's chart that the patient "was hostile, very belligerent, cursing, spitting, very resistive to any assistance" and "very conscious." The examining physician in the hospital emergency room noted that the patient appeared to be "psychotic" and "suicidal" and should be "restrained in the orthopedic ward." The nurses' chart entry on July 11 noted the boy's irrational behavior and the resident physician who again examined the patient on that day recorded "still psychotic . . . He is actively suicidal and should be treated accordingly." He was removed to an orthopedic ward and kept under restraint.

Defendant contends that the plaintiff son's conduct was volitional and responsible and therefore the proximate cause of his own injuries and that the son was also guilty of contributory negligence as a matter of law; that accordingly, the court erred in refusing to sustain defendant's challenge to the sufficiency of the evidence and in refusing to grant judgment notwithstanding the verdict. In our opinion, these contentions cannot be upheld.

██ It is difficult to distinguish between the scope of the duty owed by the hospital to the patient and the doctrine of proximate cause. It has been pointed out that the failure to distinguish between the two concepts may lead to an incorrect analysis and disposition of the issues involved. W. Prosser, Torts § 49 (3d ed. 1964). The rule concerning the scope of the duty owed by a hospital to its patient is summarized in Annot., 70 A.L.R.2d 347, 348 (1960) as follows:

> The ordinary rule that the duty of a hospital toward its patients is to exercise such reasonable care for their safety as their known mental and physical condition may require, and that in a proper case this duty may extend to affording reasonable protection against self-inflicted

injury, has frequently been recognized in actions for injury or death to a patient alleged to have resulted from his escape or attempted escape.

(Footnote omitted.) Washington follows the foregoing rule. *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 387 P.2d 527 (1963); *Benjamin v. Havens, Inc.*, 60 Wn.2d 196, 373 P.2d 109 (1962); *Kent v. Whitaker*, 58 Wn.2d 569, 364 P.2d 556 (1961); *Roth v. Havens, Inc.*, 56 Wn.2d 393, 353 P.2d 159 (1960). We need not consider whether the duty of care to guard against a known physical and mental condition of a patient also extends to the condition of the patient discoverable by the hospital in the exercise of reasonable care. *Foley v. Bishop Clarkson Memorial Hosp.*, 185 Neb. 89, 173 N.W.2d 881 (1970); *see Benjamin v. Havens, Inc., supra.* It is not necessary that the hospital anticipate the precise accident and injuries that occur. It is enough if the escape and injuries are not beyond the terms of reasonable expectation. *Benjamin v. Havens, Inc., supra; Kent v. Whitaker, supra;* Annot., 70 A.L.R.2d 347 (1960). Defendant does not claim that the standard of care owing in the instant case is any less stringent because Harborview Hospital is a public hospital operated by King County rather than a private hospital in other respects similarly situated. RCW 36.62; RCW 4.96.010. Nor does defendant distinguish between liability to the plaintiff son and the plaintiff father.

■ From what has been said, it is apparent that the scope of duty owing by the hospital to its patients includes the duty to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm through escape. The foreseeable risk of harm has been applied to acts intentional in nature. *Kent v. Whitaker, supra;* Annot., 70 A.L.R.2d 347 (1960). *See generally McLeod v. Grant County School Dist.*, 42 Wn.2d 316, 255 P.2d 360 (1953); *Whitehead v. Stringer*, 106 Wash. 501, 180 P. 486, 5 A.L.R. 358 (1919); W. Prosser, Torts § 51, at 311-14 (3d ed. 1964). Whether the risk is reasonably foreseeable is a jury question. *Benjamin v. Havens, Inc., supra* at 207. In *Vistica v. Presbyterian Hosp. & Medical Center*, 67 Cal. 2d 465, 432 P.2d 193, 62 Cal.

Rptr. 577 (1967), a wrongful death action brought against a hospital, the patient jumped from a hospital window. The court held it was error to instruct the jury that it could draw an inference of the hospital's negligence if it found out that the patient's death "was 'caused while she was exclusively under the physical care or control of the defendant hospital in the psychiatric ward . . . and was not due to any voluntary action or contribution by [the patient].' " *Vistica*, 67 Cal. 2d at 469, 432 P.2d at 196, 62 Cal. Rptr. at 580. The reason assigned was:

> The jury might have misunderstood the requirement to mean that [the patient's] voluntary participation in her own attempted escape, and resultant death, precluded an inference that it was more probable than not that the hospital breached its duty of care to protect her from her own actions, voluntary or involuntary.

*Vistica*, 67 Cal. 2d at 471, 432 P.2d at 196, 62 Cal. Rptr. at 580.

Defendant directs his argument, however, not so much to the violation of the duty owed as to the question of proximate cause. It contends that Jerome's own conduct was volitional, responsible or alternatively contributorially negligent as a matter of law and therefore either an intervening or superseding cause of the complained of self-inflicted injuries. To support these contentions, defendant particularly relies on *Schwab v. Department of Labor & Indus.*, 76 Wn.2d 784, 459 P.2d 1 (1969); *Orcutt v. Spokane County*, 58 Wn.2d 846, 364 P.2d 1102 (1961); *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 P. 436 (1930).

In order to determine their applicability to the facts in the instant case, it is necessary to briefly analyze the relationship between the scope of the duty owed and the doctrine of proximate cause. It is recognized that the concept of proximate cause has been much considered. *See* W. Prosser, Torts §§ 49-52 (3d ed. 1964); 2 F. Harper & F. James, Law of Torts §§ 20.4-20.6 (1956). The scope of the duty owed may well determine what legal effect is to be given to proximate cause, however defined, in determining the existence, extent and duration of liability. A duty limited in

scope, such as a driver's duty to stop or yield a right-of-way, or to warn of danger or drive carefully may create liability for self-inflicted harm by irresistible impulse. If however, in such cases, the self-inflicted harm is not the product of irresistible impulse, that is, self-inflicted volitionally and responsibly or negligently, then the injured party's conduct is a superseding or intervening cause and the initial actor is not liable. As later appears, *Orcutt v. Spokane County, supra,* and *Arsnow v. Red Top Cab Co., supra,* fall within these rules.

■ A duty broad in scope, such as the hospital's duty to safeguard its patient under its exclusive control in a closed psychiatric ward, against the reasonably foreseeable risk of self-inflicted injuries, is another matter. Such a duty contemplates the reasonably foreseeable occurrence of self-inflicted injury whether or not the occurrence is the product of the injured person's volitional or negligent act. *Vistica v. Presbyterian Hosp. & Medical Center, supra.* In principle, as between the actor and the injured party, the necessary effect of such a duty undertaken or imposed during its operative period may be said to absolve the injured party from the performance of his otherwise existing duty to take reasonable care to avoid self-injury. He is not called upon to perform the duty of the actor. *See e.g., Kusah v. McCorkle,* 100 Wash. 318, 326, 170 P. 1023 (1918). The injured party being absolved from the duty of self-care, the question of the injured party's conduct, whether or not volitional or whether or not otherwise constituting contributory negligence, does not arise. In the absence of a duty breached, the question of whether the injured party's conduct is a proximate cause becomes irrelevant. It therefore becomes unnecessary to consider whether his reasonably foreseeable conduct is a superseding or intervening cause so as to immunize the actor from liability. Any other rule would render the actor's duty meaningless. The rule would in the same breath both affirm and negate the duty undertaken or imposed by law. The wrongdoer could become indifferent to the performance of his duty knowing that the very eventuality that he was under a duty to prevent

would, upon its occurrence, relieve him from responsibility. As stated in W. Prosser, Torts § 51, at 312 (3d ed. 1964) in discussing foreseeable intervening causes:

> Obviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass . . . The courts are quite generally agreed that the intervening causes which fall fairly in this category will not supersede the defendant's responsibility.

(Footnote omitted.) *See also* 2 F. Harper & F. James, Law of Torts § 20.5, at 1143-46 (1956). On the other hand, if the injured party's conduct is not reasonably foreseeable by the actor, then that conduct has legal effect either because the injured party with respect thereto has a duty to take reasonable care to protect himself from injury or because that conduct is the proximate cause of those injuries. In *Vistica v. Presbyterian Hosp. & Medical Center, supra,* the hospital-patient case above referred to, the court, in dealing with the defense of the patient's contributory negligence, said, quoting *Zentz v. Coca Cola Bottling Co.,* 39 Cal. 2d 436, 247 P.2d 344 (1952), " '[I]t's purpose . . . is merely to assist the court in determining whether it is more probable than not that the defendant was responsible for the accident. . . .' " *Vistica,* 67 Cal. 2d at 470, 432 P.2d at 196, 62 Cal. Rptr. at 580. This statement is understandable under the rule that as to reasonably unforeseeable consequences, the injured party is liable for his own self-inflicted injuries. *See* W. Prosser, Torts § 50 (3d ed. 1964).

In light of the principles above discussed the *Schwab, Orcutt* and *Arsnow* cases are distinguishable. *Schwab* involved a claim for a widow's pension under the workmen's compensation act. RCW 51.32.020 is a defense to such a claim "if . . . death results to a workman from the deliberate intention of the workman himself to produce such . . . death . . . ." The duty to safeguard against reasonably foreseeable acts of the injured party, whether volitional or negligent, is not involved. *Arsnow* and *Orcutt* were each wrongful death cases based on negligently

caused collisions which in turn were claimed to cause suicide by uncontrollable impulse. These cases deal with acts done during claimed insanity or impaired mental condition caused by negligent conduct. Indeed, *Orcutt* expressly follows Restatement (Second) of Torts § 455 (1965). *Arsnow* is relied on in the explanation of that section. Restatement (Second) of Torts, Appendix, § 455 (1966). *See* Annot., 29 A.L.R.2d 690 (1953).

■ In the instant case, however, the impaired mental condition is not caused by the negligence complained of; the mental condition existed prior to the time the negligence occurred. It is a condition or an operative fact which gives rise to the duty of care owed. It is not the consequence of breach of the duty owed; it is a condition the known existence of which creates a duty to safeguard the plaintiff from the foreseeable consequences of its existence. The instant case therefore falls within the principles of Restatement (Second) of Torts §§ 320, 435 (1965); *see Spivey v. St. Thomas Hosp.*, 31 Tenn. App. 12, 211 S.W.2d 450, 457 (1947); *McLeod v. Grant County School Dist.*, 42 Wn.2d 316, 255 P.2d 360 (1953); *Berglund v. Spokane County*, 4 Wn.2d 309, 103 P.2d 355 (1940) in which liability is recognized for reasonably foreseeable consequences of harm, even if the harm is inflicted by others. The same rule should apply if the reasonably foreseeable harm is inflicted by the injured party himself. 2 F. Harper & F. James, Law of Torts § 20.5, at 1145-46 (1956). As pointed out in *Adams v. State*, 71 Wn.2d 414, 422, 429 P.2d 109 (1967):

> We perceive little difference from the standpoint of the requirements of legal liability, whether the actions of the patient causing her injury were motivated by a desire for self-destruction, self-injury, or defiance of authority. The risk of injury was foreseen, orders were given to prevent such injury, and had those orders been followed, the injury would not have occurred.

■■ Defendant contends further that involuntariness must be proved by expert medical testimony. We have pointed out that involuntariness is not essential to liability. If it were assumed otherwise, it should be pointed out also

that we are not concerned in the instant case with improper medical diagnosis or treatment. The negligence here claimed is administrative in character, namely, the hospital's failure to keep the utility room door locked as the hospital's own rule required, thus permitting the patient to escape to his injury. The type of administrative negligence here involved is within the common knowledge of jurors; and medical expertise is not required for the purpose of determining whether such negligence exists. *Kent v. Whitaker*, 58 Wn.2d 569, 364 P.2d 556 (1961); *Mounds Park Hosp. v. Von Eye*, 245 F.2d 756 (8th Cir. 1957); *Meier v. Ross Gen. Hosp.*, 69 Cal. 2d 420, 445 P.2d 519, 71 Cal. Rptr. 903 (1968). Nor is medical expertise necessarily essential on the issue of the impairment of plaintiff's mental capacity as it bears on the issues here. Lay testimony may be received on that issue. *Rust v. Washington Tool & Hardware Co.*, 101 Wash. 552, 172 P. 846 (1918); *Cameron v. Benefit Ass'n of Ry. Employees*, 6 Wn.2d 440, 107 P.2d 1096 (1940); *Halbach v. Luckenbach S.S. Co.*, 152 Wash. 492, 278 P. 178 (1929); *see generally* Annot., 40 A.L.R.2d 15 (1955).

Defendant pleaded and assumed the burden of proving that the plaintiff son was guilty of contributory negligence, including volitional action. It is true that contributory negligence may consist of the "failure to discover or appreciate a risk which would be apparent to a reasonable man, or an inadvertent mistake in dealing with it . . ." It is also true that contributory negligence may be "an intentional exposure to a danger of which the plaintiff is aware." W. Prosser, Torts § 64, at 434 (3d ed. 1964).

■ To the extent that contributory negligence may be said to be a defense, it is prerequisite to a defense of contributory negligence in a hospital-patient case that the patient be capable of exercising the care of a reasonable man, *i.e.*, able to appreciate the risk of harm and able to act reasonably on the basis thereof. *See De Martini v. Alexander Sanitarium, Inc.*, 192 Cal. App. 2d 442, 13 Cal. Rptr. 564 (1961); Annot., 91 A.L.R.2d 392, § 5 (1963). Under the evidence here, the issue of foreseeability of self-inflicted

harm which defines the scope of the duty (*Benjamin v. Havens, Inc., supra*) and the issue of the patient's capacity to exercise reasonable care, *i.e.*, capacity to be contributorially negligent, were questions for the jury. *See Hillebrandt v. Manz,* 71 Wash. 250, 128 P. 892 (1912).

■ Defendant contends that the court erred in giving instruction 3 dealing with contributory negligence;[1] that the instruction should have been changed to submit the issue of whether the patient's acts were performed by a responsible person. Defendant excepted to the use of the world "capable" as insufficient to raise the issue of responsible action. The instruction, however, was directed to the defense of contributory negligence raised by defendant and the use of the word "capable" in that instruction was appropriately directed to the issue of Jerome's ability to appreciate the risk of harm and the ability to act reasonably on the basis thereof. If defendant wished a separate instruction on the significance of volitional or responsible conduct not reasonably foreseeable by the hospital, defendant had a duty to propose such an instruction. It did not do so. Even voluntary participation by the plaintiff in his own escape is not a defense if such conduct is reasonably foreseeable. *See Vistica v. Presbyterian Hosp. & Medical Center, supra.*

Defendant finally contends that instruction 6[2] departed

---

[1] "The defendant has claimed that the plaintiff Jerome Hunt was guilty of contributory negligence at the time and place of the event in question.

"You are instructed that contributory negligence is negligence on the part of a person claiming injury or damage which is a proximate cause of the injury or damage complained of. Contributory negligence bars recovery on the part of a person suffering injury or damage, even though the opposing party is negligent.

"You are further instructed that if you find that the plaintiff Jerome Hunt was in fact at the time of the event in question capable of exercising the care of a reasonably prudent man under the circumstances, then you may consider this question of contributory negligence.

"On the other hand, if you find that at said time the plaintiff was not in fact capable of exercising the care of a reasonably prudent man, then such claim does not constitute a defense."

[2] "You are instructed that when a hospital accepts a patient on a

from the standard of care adopted in *Cochran v. Harrison Memorial Hosp.,* 42 Wn.2d 264, 254 P.2d 752 (1953) and *Adams v. State,* 71 Wn.2d 414, 429 P.2d 109 (1967). It is claimed that the instruction should not have been given because there is no evidence that the patient had a suicidal or self-destructive intention to be accomplished by jumping through the window. In our opinion, for the reasons above discussed, the standard of care was correctly stated and the evidence was sufficient to warrant the instruction. Defendant criticizes the use of the word "escape" as inadequate. The word "escape" in the context used was explained in instruction 2 as "escape from hospital confinement through an unbarred window on the fifth floor of the hospital on July 10, 1967, at approximately 7 p.m. and his fall five floors to the ground." Defendant also criticizes the use of the phrase "closed psychiatric ward." The phrase "closed psychiatric ward" was made clear in the evidence earlier summarized. We do not believe that the jury was misled by the terms used. Any rule applicable to an open ward was not pertinent under the evidence; and if it were, the defendant did not request the court to state the applicable rule. We find no reversible error.

The judgment is affirmed.

UTTER and WILLIAMS, JJ., concur.

Petition for rehearing denied February 22, 1971.

Review denied by Supreme Court March 25, 1971.

---

closed psychiatric ward, the hospital is required not only to use reasonable care in treating the patient for his illness, but also reasonable care in safeguarding him from self-inflicted injuries or escape. This duty does not make the hospital absolutely liable for its patient's safety but it is obliged to avert hazards which a reasonably prudent hospital operator under the circumstances would anticipate was likely to happen. The duty is proportionate to the patient's needs; that is, such reasonable care and attention as the patient's known mental condition requires."