[No. 35267.    *En Banc.*    September 28, 1961.]

ETHA ORCUTT, *as Administratrix, Appellant,* v. SPOKANE
COUNTY, *Respondent.*\*

*Reported in 364 P. (2d) 1102.

*Kizer, Gaiser, Stoeve, Layman & Powell, Benjamin H. Kizer, Robert E. Stoeve,* and *John G. Layman,* for appellant.

*Del Cary Smith, Del Cary Smith, Jr.,* and *Thomas S. Foley,* for respondent.

HUNTER, J.—This action was commenced by the plaintiff (appellant) as the administratrix of the estate of Marion Trickey, deceased, to recover damages for the decedent's pain and suffering and medical and hospital expenses incurred prior to her death, and for her wrongful death. In support of both of these claims, the plaintiff alleged the injuries and pain and suffering proximately caused the decedent to become seized by an uncontrollable impulse to take her own life, which she did by consuming an overdose of sleeping pills.

At the close of the plaintiff's case, the defendant (respondent) entered a motion to dismiss the action with prejudice on grounds that the evidence was insufficient to show the accident, allegedly caused by the defendant's negligence, proximately caused the decedent's death. Upon

the basis of this motion, the trial court entered judgment of dismissal with prejudice, from which the plaintiff appeals.

A portion of the Wild Rose Road, a Spokane County road, washed out in the late afternoon or early evening of January 4, 1956. Later that evening, an automobile in which the decedent was a passenger fell into the washout, causing the decedent to sustain severe injuries, particularly to her head and face. Evidence was introduced by the plaintiff in support of her allegation that the defendant knew or should have known, in the exercise of reasonable care, of the danger that this washout might occur and should have taken measures to avoid the washout or to warn users of the road of the danger. As a result of the accident, both of the occupants of the automobile were rendered unconscious. Sometime later, they extricated themselves from the wreckage and made their way to a nearby residence.

The decedent was taken to a hospital where it was determined she had suffered fractures of the nose and of the bone under her left eye, fractures of several ribs, a fracture of the right shoulder blade, a compound fracture of the ring finger of her left hand, and a concussion of the brain. The fractured ribs were displaced, causing a partial collapse of her lung. An open reduction was necessary in order to set the fractured bone in her finger. She also suffered multiple cuts upon her face which left scars. In June, 1956, an operation to remove a portion of a bone under her nose was required in order to provide adequate passage of air through her nasal passages.

In the fall of 1956, the decedent began residing in Phoenix, Arizona, with her daughter and son-in-law. She returned to Spokane in the first part of December, 1956. During this sojourn in Spokane, she twice consulted Dr. Southcombe, a neuro-psychiatrist. Thereafter, she returned to Phoenix.

In January, 1957, the decedent consumed about eight sleeping pills during an absence of her daughter and son-in-law from the house. However, she was discovered, awak-

ened and revived by her daughter. About a month later, the daughter found a pistol in a kitchen chair while her mother was sleeping nearby. In September, 1957, about a month prior to her death, the decedent entered the main bedroom in the house, locked the door behind her, and took a pistol from a closet. Her daughter, becoming suspicious, demanded and eventually obtained entry into the bedroom, where she discovered her mother had concealed a pistol under her skirt.

On October 11, 1957, the decedent obtained a prescription for thirty-six sleeping pills, more than she had been able to obtain before, and picked them up at a drugstore. On Sunday, two days later, the daughter and her family planned a day-long trip; the decedent was invited to accompany them, but she refused. She appeared to be in good spirits when her daughter and the family left. When they returned that evening, the house was found to be locked. Once they gained entry into the house, the decedent was discovered upon a bed in an unresponsive condition, clad in new under-garments, a new nightgown, a nice housecoat and a pair of slippers. She was rushed to a hospital where she was declared dead. At the time of her death, the decedent was forty-seven years old. In the investigation to determine the cause of death, an empty pill bottle from which the label had been torn was found on a window sill in the bedroom behind some drapes, and a glass of water was found under the bed.

In the first assignment of error, the plaintiff contends the trial court erred in granting the defendant's motion to dismiss the action for wrongful death, on the ground that, as a matter of law, there was insufficient evidence to raise a jury question as to whether the decedent's suicide was caused by any wrongful act, neglect or default of the de-fendant. (The sufficiency of the evidence as to whether the *automobile accident* was proximately caused by negli-gence on the part of the defendant is not raised in this appeal.)

■ The rule to be applied in making such a determina-

tion was stated by this court in the exhaustive opinion of *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 Pac. 436 (1930). We said:

". . . In such cases as this, liability may exist on the part of a person, situated as is defendant here, where the death of the person injured results from his own act committed in delirium or frenzy, and without consciousness or appreciation on his part of the fact that such act will, in all reasonable probability, result in his death, or *when the act causing the death is the result of an uncontrollable impulse, resulting from a mental condition caused by the injuries. . . .*" (Italics ours.)

In the *Arsnow* case, the decedent was severely injured by a taxicab owned and operated by the defendant. Thereafter, the decedent committed suicide. The administratrix of his estate brought an action for his pain and suffering prior to his death, and for his wrongful death. The evidence disclosed that the decedent had often threatened to shoot himself after the accident. On the morning of the decedent's death, his wife had placed his pistol under the pillow on his bed, where he had been keeping it, while the decedent was sitting in a chair at the foot of the bed. While she was sleeping the decedent arose from his chair, proceeded to the head of the bed, took the pistol from beneath the pillow, released a safety catch, pressed the muzzle of the pistol to his head and pulled the trigger. We held these facts were insufficient to establish the decedent's death was caused by the injuries resulting from the defendant's wrongful acts.

The rule stated in the *Arsnow* case was and still is correct. Furthermore, it is in conformity with the rule as expressed by many text writers, and it reflects the weight of case law in other jurisdictions. Although this rule has been stated in various ways, it has the same underlying meaning.

The Restatement of the Law of Torts, § 455 (1934), expresses the rule to be as follows:

"If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other

to himself while delirious or insane, if his delirium or insanity

"(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

"(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

"  .   .   .

"*Comment on Clause* (a):

"*b.* Clause (a) is applicable when the other's insanity is so extreme as to prevent him from understanding what he is doing or, if he understands what he is doing, from understanding its inevitable or probable consequences. It also applies to acts done during delirium.

"  .   .   .

"*Comment on Clause* (b):

"*c.* This Clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequence of his act or from forming a purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as his insanity leaves to the person laboring under them.

"  .   .   .

"*Comment*:

"*d.* On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life because of his dread of the increasingly frequent recurrence of these attacks."

In discussing proximate causation, Dean Prosser states:

"Some difficulty has arisen in cases where the injured person becomes insane and commits suicide. Although there are cases to the contrary, it seems the better view that when his insanity prevents him from realizing the nature of his act *or controlling his conduct,* his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable. The situation is the same as if he should hurt himself during unconsciousness or delirium brought

on by the injury. But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supersedes the defendant's liability." (Italics ours.) Prosser, Torts § 49 (2d ed. 1955).

Quite recently, a California court reviewed and applied this rule in *Tate v. Canonica,* 180 Cal. App. (2d) 898, 5 Cal. Rptr. 28 (1960), stating

"As this is a case of first impression in California we agree with the New York court that the more realistic approach to the problem is to adopt the before mentioned rule, namely, that where the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if *the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of 'insanity,' and of 'delirium or frenzy,' and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in the light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent 'knew what he was doing'. If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.*" (Italics ours.)

▮ The difficulty encountered in considering the *Arsnow* case as authority for the disposition of the instant case, however, is the manner in which we applied the rule to the facts of that case. In applying the rule, it appears we restricted its application in the respect that in all cases where the decedent knows the nature of his act, or where his actions indicate the use of reasoning in carrying out the acts resulting in his death, the suicide will be considered an independent intervening cause, for which the defendant will not be liable. We are of the opinion that such an application of the rule, although proper in the *Arsnow* case,

is not proper in a case where there is medical testimony that the injury sustained by the decedent caused a mental condition which resulted in an uncontrollable impulse to commit suicide, in the sense that the decedent could not have decided against and refrained from killing himself, and because of such uncontrollable impulse, the decedent committed suicide.

We have often held that in actions in which recovery is sought for physical conditions allegedly resulting from injuries inflicted by the wrongful act of the defendant, the plaintiff must produce evidence to establish, with reasonable certainty, a causal relationship between the injury and the subsequent condition, so that the jury will not be indulging in speculation and conjecture in passing upon this issue. *Anton v. Chicago, Milwaukee & St. Paul R. Co.,* 92 Wash. 305, 159 Pac. 115 (1916); *Lee v. H. E. Gleason Co.,* 146 Wash. 66, 262 Pac. 133 (1927); *Hessler v. Moore,* 188 Wash. 80, 61 P. (2d) 1001 (1936). Although we have held this may be established by circumstantial evidence (*Lee v. H. E. Gleason Co., supra*), medical testimony is necessary when the causal relationship is not clearly disclosed by the circumstantial evidence. Moreover, we have held this medical testimony must at least be that the injury "probably" or "more likely than not" caused the subsequent condition, rather than that the accident or injury "might have," "could have," or "possibly did" cause the subsequent condition. *Bland v. King County,* 55 Wn. (2d) 902, 342 P. (2d) 599 (1959); *Clevenger v. Fonseca,* 55 Wn. (2d) 25, 345 P. (2d) 1098 (1959).

In the *Arsnow* case the evidence was not sufficient to establish, beyond speculation and conjecture, that the injuries inflicted by the defendant caused the decedent to enter into a state of delirium or frenzy or to become subjected to an insane and uncontrollable impulse to commit suicide, resulting in death at his own hand. The only evidence upon which the plaintiff relied was circumstantial, which did not disclose with reasonable certainty to persons not having medical expertise, that the injuries inflicted by

the defendant caused either a state of delirium or frenzy, or an uncontrollable impulse to commit suicide.

In the instant case, however, the plaintiff has introduced medical testimony to establish the necessary cause and effect relationship. This medical witness, Dr. Southcombe, who was qualified as an expert witness and who had twice examined the decedent prior to her death, testified as follows:

"Q Then, Dr. Southcombe, after you had received a history from her regarding her complaints or symptoms, did you conduct a neurological examination? A Yes, sir. Q Would you give us the results of your neurological examination, explaining the examination and procedure? A Well, the results of the neurological examination indicated to me that the patient had received some damage to her nervous system, as indicated by the disorder sensations in her face. . . . She had a peculiar sensation about the face which we call dysthesia. She had a definite decrease in sensation, hypesthesia, in her face, she had a serious fracture of the nose, and her face was scarred. It was my opinion that this woman had organic damage to the nervous system, which I considered to be post concussion syndrome. . . . I think she suffered two types of injuries, I think she suffered a peripheral nerve damage, damage to the face, due to the fracture, and because of the obvious evidence of rather violent trauma to the face, the scars, and the existence of the fractures, that has a bearing on her complaints, her irritability, her headaches, dizziness, and it was my opinion that she had a post concussion syndrome. Q. What is a post concussion syndrome, doctor? What is the generally understood meaning of that term? A Well, a post concussion syndrome is a condition which follows the application of violence to the head. It is characterized by subjective symptoms of dizziness, vertigo, dizziness, headache, and, depending on the severity of the other factors, the manifestation may be more dramatic. . . . Q Dr. Southcombe, bearing in mind the type of injuries that Mrs. Trickey received from this automobile accident, injuries to the nose and to the bones in the front of the face, was it your opinion that, as a result of the injuries, that there was damage to her brain? A I think, in contemplation of the extent of the injuries, and the resulting symptoms, that it was very probable that there was brain damage."

At this point, a hypothetical question was propounded to Dr. Southcombe, including all the facts of the case theretofore submitted into evidence, in which the witness was asked what his opinion then was as to the relationship between the suicide of the decedent and the automobile accident. His response was,

"It is my opinion, predicated on what I learned from Mrs. Trickey, and the facts as you have presented them, that the suicide was the final link in a chain, the first link of which was the accident suffered by Mrs. Trickey. . . . It is my opinion that one of the most serious things that can happen to an individual is trauma applied to the head. Particularly without a fracture of the skull. In a situation where the trauma is sufficiently severe to break the nose, fracture the maxillary bone, produce lacerations, and immediately result in a period of unconsciousness, that it is very probable, in my opinion, that damage has been done to the brain, particularly to the frontal lobes, because as the stops against whatever obstacle stopped it, the brain goes up against the rough interior of the skull, and if there is damage done to the cortex of the brain, depending on the degree of force involved, it results in one very real hazard, and that is the hazard of a personality change. The frontal lobes are the site of the personality areas in the human individual. That fact, in my opinion, coupled with the realization that she would be scarred, that she had considerable difficulty with the sensation on her face, the physical sensations in the teeth; those factors combined and preexisted a mental disorder, indicated, I think, by the suicidal gesture with the 12 grains of seconal on one occasion, the suicidal attempt with the revolver on two occasions, and finally the individual is overwhelmed by the combination of the factors which resulted in the ultimate destruction of herself. This brain damage, this psychological reaction to the injury resulting in an emotional disorder, culminating in an overwhelming force that she cannot control; it is an uncontrollable force, an uncontrollable impulse that leads to the suicide. To me, the suicide is the last link in this series of events in that order."

On cross-examination, Dr. Southcombe was asked his definition of the term, "uncontrollable impulse." He replied,

"An uncontrollable impulse, would be a force arising within a person, of such violence that that person could not

control that force. . . . Q Would you say a person acting from an uncontrollable impulse, is not exercising any volition, is that what you mean? A No, I would say a person acting under an uncontrollable impulse is not exercising their will. . . . Q Do you think that the act which Mrs. Trickey apparently performed, was the result of a sudden impulse, or was it of long standing, caused by depression and despondency? A I think the suicide was the immediate result of this uncontrolled, uncontrollable impulse or drive, which, in turn, was the result of a disordered mental state, which, in turn, was due to two things, one—and this to me is very important—a very probable injury to the frontal lobes of her brain. . . . A I think she understood what she was doing. You asked me whether she knew what she was doing? My answer is, yes, she did, but she couldn't resist it."

■ The foregoing testimony of Dr. Southcombe constitutes substantive evidence in the record that the decedent's death was the result of an uncontrollable impulse, which was caused by the injuries sustained in the accident. Giving this evidence all inferences most favorable to the plaintiff, the jury would be justified in concluding, without resorting to speculation and conjecture, that the decedent took her own life pursuant to an uncontrollable impulse while in a state of insanity, caused by injuries sustained in the accident.

Further support for such an application of the rule is found in the workmen's compensation cases decided in this state since the *Arsnow case*. In the latest workmen's compensation case in which the workman had committed suicide, *Karlen v. Department of Labor & Industries*, 41 Wn. (2d) 301, 249 P. (2d) 364 (1952) we held,

" . . . if an injured workman takes his own life pursuant to an irresistible or uncontrollable impulse so to do, his widow is entitled to a pension. *Gatterdam v. Department of Labor & Industries*, 185 Wash. 628, 56 P. (2d) 693; *McFarland v. Department of Labor & Industries*, 188 Wash. 357, 62 P. (2d) 714."

In the *Karlen* case, several witnesses testified as to what they observed concerning the attitude and conduct of the decedent after he was injured as compared with conditions

theretofore existing. They stated that prior to his injuries he was a pleasant and jovial person, enjoyed fishing and hunting and was interested in his gardening and the beautification of his home; that he had a happy, carefree disposition and never appeared to be depressed or morose; that shortly after his accident, his outlook on life seemed to change and he became moody and morose; that he despaired of ever being able to work again and he spoke frequently of dying and even invited friends to come to his funeral. Furthermore,

"There was *medical testimony* to the effect that a person afflicted with manic-depressive psychosis had feelings of depression, loss of efficiency, inability to carry on, and outwardly presented a picture of dejection and somewhat slowed down activities. Medical experts gave their opinion that, when decedent took his life, he was capable of forming a deliberate intent so to do, and that his act was voluntary rather than induced by any irresistible impulse. *Other medical opinion was that his act was impelled by an irresistible impulse rather than an act of deliberate intention.*" (Italics ours.)

We held,

" . . . from an examination of the record that there was sufficient evidence from which the jury could give a negative answer to the interrogatory propounded to the effect that the decedent's death resulted from a deliberate voluntary intent to take his own life; also that the instructions given by the court furnished a correct guide."

We are satisfied that in applying the well-established rule stated in the *Arsnow* case to the facts of the instant case, the trial court erred in holding there was insufficient evidence for the case to be sent to the jury on the issue of whether or not the decedent's death was the result of an uncontrollable impulse while insane, caused from the injuries she sustained in the automobile accident.

■ The final assignment of error made by the plaintiff, that the trial court erred in dismissing the cause of action for pain and suffering and medical and hospital expenses incurred prior to her death, is well taken. In the event the jury should find that negligent acts of the defendant

caused the decedent's death, her personal representative would be entitled to recover damages alleged to have been sustained in the second cause of action under RCW 4.20.060.

The judgment of the trial court is reversed, and the case is remanded for a new trial on all issues.

The costs on this appeal shall abide the final determination of the case.

Rosellini and Foster, JJ., concur.

Finley, C. J. (concurring)—I agree with the analysis of the problem involved and the disposition of this appeal as set out in the majority opinion. Whether the defendant's negligence proximately caused a state of mind or an irresistable impulse resulting in decedent's suicide is a question which should be determined by the trier of fact.

The dissenting opinion characterizes the decedent's act as voluntary, since it was not done in a state of delirium or frenzy. A statement that "she knew precisely what she was doing and what the effect of her act would be" is followed by a conclusion that her actions were controlled. Then a conclusion is expressed that because her act was voluntary the initial cause of the decedent's injuries ceased to be the proximate cause of her death.

I do not know whether an act done by an individual not in a state of delirium or frenzy is controllable or not in medical psychiatric theory. I doubt whether the terms have a precise medical or, for that matter, legal meaning. In any event, the characterizations employed in the dissent do not solve anything. The testimony of the medical expert, as quoted in the majority opinion, was that the decedent knew what she was doing, *"but she couldn't resist it."* The rule of *Arsnow v. Red Top Cab Co.* (1930), 159 Wash. 137, 292 Pac. 436, imposes liability when (1) "the death of the person injured results from his own act committed in delirium or frenzy, and without consciousness or appreciation on his part of the fact that such act will, in all reasonable probability, result in his death," *or* (2) "when the act causing the death is the result of an uncontrollable impulse, resulting from a mental condition caused by the

injuries." It seems to me utterly inescapable that the testimony of the medical expert puts the plaintiff's case squarely within the second portion of the *Arsnow* rule, irrespective of the matter of delirium or frenzy.

I cannot believe that the dissent intends to dispute the accuracy of the conclusions of an expert whose observations are tempered by prolonged specialized study and research. There is nothing in the record to discredit the expert's opinion or his qualifications. Opinion evidence is substantive evidence. Because of the present procedural posture of this case, we must give this evidence all inferences most favorable to the plaintiff. We cannot, therefore, say that as a matter of law the expert's opinion does not emanate from a reliable school of medical thought, and we cannot ignore it.

It seems to me that the dissent, although it is written in terms of proximate cause, enunciates a policy rule that the defendant should be relieved of liability for the reason that causes other than the defendant's negligence may have been more significant or played a more important role in occasioning the tragic event. I cannot accept this approach, because we are not faced with the problem of reviewing the merits of plaintiff's case. Our function is to determine if the plaintiff presented substantive evidence on any material issue. The defendant may introduce controverting expert medical psychiatric evidence challenging the validity and reliability of the testimony of plaintiff's expert, and his qualifications may be controverted. In fact, defendant may utilize any defense available; but these things must be done at the trial court level.

The plaintiff produced testimony to the effect that the injuries suffered by the decedent produced a mental state rendering the decedent incapable of controlling the impulse to commit suicide. This was sufficient to withstand a motion to dismiss. I concur in the majority opinion and would remand the case for a new trial.

WEAVER, J., concurs with FINLEY, C. J.

MALLERY, J. (dissenting) — From January to October, 1957, the decedent was frustrated by others in repeated attempts at suicide. She then achieved what to her seemed a desirable result by the deliberate use of understood means. The cause of death is not challenged. Instead, the majority opinion holds that a cause of the cause is the proximate cause, *i.e.*, that the cause of her mental state is the proximate cause of her death. I agree that a cause continues to be a proximate cause of all of the effects which are directly and exclusively produced by it. Notwithstanding this, a cause ceases to be a *proximate* cause when an independent and efficient cause intervenes between it and the effect in question.

Our concern in this case is with the nature of intervening independent causes. I can agree that they are not the mere changes of aspect which mechanical forces produce in the course of natural processes. The interposition of an independent, voluntary and understanding human agency, without which the process set in motion by the initial cause would have ended prior to or without the effect in question, breaks the chain of causation and makes the initial cause remote. This is, of course, not the case where the initial cause deprives the mind of volition and understanding of natural processes. A human act then is no more than a mechanical continuation of the process set in motion by the initial cause. Thus, the cause of a mental state of delirium is the proximate cause of what the delirious person unwittingly does. The cause which produced an uncontrollable frenzy is for the same reason the cause of the effects thereof.

This is the rule of *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 Pac. 436, which is precisely in point and which the majority opinion overrules *sub silentio*. The decedent was not delirious. She knew precisely what she was doing and what the effect of her act would be, neither did she act in an uncontrollable frenzy. Under these circumstances, her knowing and intentional act was not the mechanical continuation of such a natural process as to be logically attributable to the defendants.

The majority opinion, in basing its result on *uncontrollability*, seems to hold either that the decedent did not want to commit suicide and, without knowingly intending to achieve that result, surrendered to an uncontrollable impulse to take the thirty-six sleeping pills, which theory is factually untenable, or that in following a course, which we think was unwise, acted pursuant to an *uncontrollable* election of conduct. Insanity does not make every unwise human act uncontrollable. On the contrary a desired end is achieved by an act that is specifically controlled for that purpose. Otherwise, every unwise act is *uncontrollable* within the purview of the majority opinion.

I dissent.

HILL, DONWORTH, and OTT, JJ., concur with MALLERY, J.

---

December 11, 1961. Petition for rehearing denied.