IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| LEAH CAMPANELLI and KEITH CAMPANELLI, wife and husband,<br><br>Appellants,<br><br>v.<br><br>PEACEHEALTH SOUTHWEST MEDICAL CENTER, a Washington Corporation; SHANNON LORRAINE SATHRE and THOMAS LEO SATHRE and their marital community; DR. WAEL Y. MUSLEH; and NORTHWEST SURGICAL SPECIALISTS, P.C.,<br><br>Respondents,<br><br>REBOUND ORTHOPEDICS AND NEUROSURGERY,<br><br>Defendant. | No. 86615-0-I<br><br><br><br><br><br><br><br>ORDER DENYING MOTION FOR RECONSIDERATION AND AMENDING OPINION |

Appellants Leah and Keith Campanelli filed a motion for reconsideration of the opinion filed on March 24, 2025 in the above-entitled case. The panel has determined the motion should be denied but the opinion amended. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied. It is hereby further

ORDERED that the opinion of this court filed on March 24, 2025 in the above-entitled case shall be amended as follows:

1. On Page 23, footnote 18, that states:

> Campanelli separately claims that RN Sathre violated the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 201. But HIPAA does not expressly create a private cause of action to enforce

a violation. *O'Donnell v. Blue Cross Blue Shield of Wyo.*, 173 F. Supp. 2d 1176, 1179 (D. Wyo. 2001). The United States Secretary of Health and Human Services, not private individuals, pursues actions against alleged offenders of HIPAA. *Id.* at 1179-80.

shall be deleted and replaced with the following footnote:

Campanelli separately claims that RN Sathre committed medical negligence by violating the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 201, and Washington's Uniform Health Care Information Act. But HIPAA does not expressly create a private cause of action to enforce a violation. *O'Donnell v. Blue Cross Blue Shield of Wyo.*, 173 F. Supp. 2d 1176, 1179 (D. Wyo. 2001). The secretary of the United States Department of Health and Human Services, not private individuals, pursues actions against alleged offenders of HIPAA. *Id.* at 1179-80. And while Campanelli argues generally that RN Sathre violated chapter 70.02 RCW, she identifies no specific provision of the Uniform Health Care Information Act prohibiting RN Sathre's disclosure. We need not address unsupported legal arguments or those given only passing treatment. *Timson v. Pierce County Fire Dist. No. 15*, 136 Wn. App. 376, 385, 149 P.3d 427 (2006).

Campanelli also contends that RN Sathre's disclosure breached a duty to Campanelli arising out of their special relationship. Citing *Fairfax Hospital v. Curtis*, 254 Va. 437, 492 S.E.2d 642 (1997), she argues that the state of Virginia has recognized a cause of action for wrongful disclosure arising from the special relationship between a doctor and their patient. And she asks that we adopt the reasoning in that case, conclude that such a duty exists in Washington, and extend that duty to the nurse/patient relationship. But again, Campanelli does not support her argument with meaningful analysis. So, we do not reach the issue. *Timson*, 136 Wn. App. At 385.

The remainder of this opinion shall remain the same.

_____, ACJ

_____ Feldman, J.

_____

2

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| LEAH CAMPANELLI and KEITH CAMPANELLI, wife and husband,<br><br>Appellants,<br><br>v.<br><br>PEACEHEALTH SOUTHWEST MEDICAL CENTER, a Washington Corporation; SHANNON LORRAINE SATHRE and THOMAS LEO SATHRE and their marital community; DR. WAEL Y. MUSLEH; and NORTHWEST SURGICAL SPECIALISTS, P.C.,<br><br>Respondents,<br><br>REBOUND ORTHOPEDICS AND NEUROSURGERY,<br><br>Defendant. | No. 86615-0-I<br><br><br><br><br>PUBLISHED OPINION |

BOWMAN, J. — Leah Campanelli appeals summary judgment dismissal of her lawsuit for medical malpractice and violations of privacy. Because her expert's testimony supported the essential elements of her medical malpractice claims at summary judgment, the trial court erred by dismissing those claims. But because a nurse's communications to the police were statutorily protected under RCW 4.24.510, and Campanelli failed to satisfy the elements of her remaining privacy claims, the trial court did not err by dismissing those claims. We affirm in part, reverse in part, and remand for further proceedings.

FACTS

In 2017, Campanelli suffered from "severe and disabling" back pain. As a result, she scheduled lumbar laminectomy surgery[1] with Dr. Wael Musleh, a neurosurgeon employed by Northwest Surgical Services.[2] Dr. Musleh also had patient privileges at PeaceHealth Southwest Medical Center in Vancouver, Washington, and he scheduled her surgery at that hospital.

During a "preoperative visit," Dr. Musleh explained to Campanelli the "expectations of surgery" and that he would "manage the pain medications." On December 18, 2017, a PeaceHealth registered nurse (RN) discussed the "Pre-Procedure Instructions" with Campanelli's husband, Keith,[3] at Campanelli's request. As part of the instructions, the nurse explained that Campanelli should leave any currently prescribed medications "at home."

PeaceHealth admitted Campanelli for surgery on December 19, 2017. During the admittance process, Campanelli told another PeaceHealth nurse that she brought medication with her to the hospital. The nurse told Keith to take the medicine home. He "verbalized that he would do so."

Dr. Musleh completed Campanelli's surgery later that day. After the surgery, a nurse requested that the hospital chaplain visit Campanelli. The hospital notes show that the nurse made the request because Campanelli "had been 'depressed and was a believer in God.' " The chaplain followed-up with

---

[1] This would be Campanelli's third spinal surgery to relieve her back pain.

[2] Rebound Orthopedics and Neurosurgery is a subdivision of Northwest Surgical.

[3] We refer to Keith Campanelli by his first name for clarity and intend no disrespect by doing so.

Campanelli and noted that she expressed suicidal ideations, but she assured him that suicide was "not something she wanted to do."

The next morning on December 20, RN Alin Bob assumed care for Campanelli. According to Campanelli, she told RN Bob that she was in severe pain and that the medications the hospital gave her were not working, so she was taking some Nucynta[4] that she brought from home to manage the pain. While RN Bob does not remember the specifics of this conversation, he wrote in Campanelli's chart that he did not administer the pain medications Oxycodone and Gabapentin to Campanelli "because patient stated she took her morning medicines."

Around 30 minutes after Campanelli's conversation with RN Bob, Dr. Musleh came to Campanelli's hospital room for a postoperative visit. Campanelli says she also told Dr. Musleh that she was in severe pain and taking Nucynta that she had brought from home. She claims Dr. Musleh did not discourage her from taking the Nucynta or otherwise inform hospital staff that she was taking any medication outside his pain management plan. According to Dr. Musleh, he told Campanelli to stop taking the Nucynta and again explained that he was managing her medication. Dr. Musleh did not ask Campanelli to relinquish or otherwise dispose of the Nucynta.

After her meeting with Dr. Musleh, Campanelli continued to experience severe pain and called Dr. Musleh's office to let him know. His office told her to continue to follow the instructions from her nurse. RN Bob then returned to

---

[4] Nucynta, also known generically as tapentadol, is an opioid pain medication used to treat moderate to severe pain.

Campanelli's room around 10:00 a.m. to check on her, and Campanelli told him she had " 'just took the whole pill bottle of Nucynta,' " which was 85 tablets. RN Bob called a "code blue."[5]

An emergency response team moved Campanelli to the intensive care unit (ICU) because it was "the [only] bed available at [the] time." Campanelli was "[t]earful and emotional," "yelling for [the nurses] to leave her alone," and "flailing [her] arms." As a result, the nurses placed her in restraints. The emergency response team then pumped charcoal into Campanelli's stomach and placed her on a Narcan[6] drip to evacuate the Nucynta from her body.

RN Shannon Sathre began caring for Campanelli in the ICU. According to Campanelli, RN Sathre removed Campanelli's restraints so Campanelli could go to the bathroom. RN Sathre then "grabbed" Campanelli's arm. When Campanelli tried to pull away and said " 'don't touch me' " and " 'let go of my arm,' " RN Sathre shoved her backward onto the bed. RN Sathre then called for assistance, and medical personnel helped her pin Campanelli to the bed to reattach the restraints. Campanelli says that she was coughing and having trouble breathing.

RN Sathre's chart notes differ from Campanelli's version of events. Her notes say that Campanelli told her she needed to urinate, so RN Sathre asked Campanelli if she wanted to get out of bed to use the bedside commode.

---

[5] "Code blue" is an emergency code used in hospitals to get the immediate response of hospital staff for a critical patient. Here, the emergency response team "immediately cancelled" the code blue because Campanelli "never lost pulse or became apn[e]ic."

[6] Narcan, known generically as naloxone, can reverse the effects of opioid overdose.

4

Campanelli said she did.  RN Sathre's chart note continues:

> [O]nce standing the [patient] started to say, "let go, leave me alone, I don't want you in here[."]  We told her we could not leave we were there for her safety, she immediately became violent started swing[ing] her arms and pushing us, we put her back onto the bed . . . . She then began kicking, striking me in the chest/upper [abdomen], she pulled her [nasogastric tube] most of the way out, was stopped by another RN, she then began spitting at the staff.

According to RN Sathre, staff placed Campanelli back in restraints "[b]riefly" and then released her when she calmed down and agreed to stop being "physically violent."

After the incident, RN Sathre called the Vancouver Police Department to report that Campanelli assaulted her.  Officer Justin Materne responded to the call.  RN Sathre explained to Officer Materne that hospital staff restrained Campanelli earlier in the day after she harmed herself by taking extra medication.  She then described for Officer Materne her version of events.  Another nurse in the room at the time of the incident corroborated RN Sathre's "exact" version of the incident.  Both nurses told Officer Materne that Campanelli did not have any severe mental conditions, and both believed Campanelli purposefully kicked RN Sathre.

Campanelli remained in the hospital for follow-up surgery on December 21, 2017.  The hospital discharged her the next day on December 22.

About a month later, RN Sathre submitted an online "news tip" to the Columbian, a local Vancouver newspaper.  She suggested a news story about patients assaulting health care workers.  In her tip, RN Sathre discussed the "high rate of employee assaults" at PeaceHealth and referenced her personal experience of being assaulted by a patient on December 20, 2017.  She said the

5

issue deserves public attention because "health[ ]care workers are frequently threatened and assaulted with no consequence to the aggressor."

Columbian health reporter Marissa Harshman contacted RN Sathre to discuss the incident. She explained that she had "gotten data from both [Vancouver] hospitals about their numbers of assault incidents and injuries" and was waiting for data from the prosecutor's office. And she asked if she could "use [RN Sathre's] experience in the story." RN Sathre agreed "as long as it doesn't interfere with the [Vancouver police] case" because the Clark County Prosecuting Attorney's Office was filing charges. RN Sathre did not name Campanelli as the aggressor in the assault. But, at Harshman's request, she provided Officer Materne's name, the police report incident number, and, later, the Clark County Superior Court cause number so that Harshman could "pull the court documents." Harshman suggested that this procedure would "avoid . . . causing any problems" because it would help her get access to the details of the assault without RN Sathre having to discuss the case.

In March 2018, the Clark County prosecutor charged Campanelli with third degree assault. In April, the Columbian published a newspaper story with Campanelli's name, a photograph of RN Sathre, and RN Sathre's description of the assault. On January 7, 2019, the prosecutor dismissed the assault charge against Campanelli due to " 'insufficient evidence to prove the charge beyond a reasonable doubt.' "

In March 2020, Campanelli sued PeaceHealth and RN Sathre for violating the Uniform Health Care Information Act, chapter 70.02 RCW, and invasion of privacy for the public disclosure of private facts, intrusion upon seclusion, and

false light portrayal. Campanelli also sued only RN Sathre for medical negligence under chapter 7.70 RCW. Finally, Campanelli made common law negligence claims against only PeaceHealth. In December 2020, Campanelli separately sued Dr. Musleh and Northwest Surgical (collectively Dr. Musleh)[7] for medical malpractice under a different cause number.

In April 2021, PeaceHealth and RN Sathre moved for summary judgment dismissal of Campanelli's lawsuit. They argued that the statute prohibiting strategic lawsuits against public participation (anti-SLAPP), RCW 4.24.510, immunized them from any claims arising from RN Sathre's communication with law enforcement.[8] The trial court granted the motion in part and dismissed Campanelli's claims against PeaceHealth and RN Sathre for violating the Uniform Health Care Information Act and for invasion of privacy for the disclosure of private facts, finding both defendants immune from liability under the anti-SLAPP statute.[9]

In October 2021, PeaceHealth and RN Sathre moved for summary judgment dismissal of Campanelli's remaining claims. Campanelli generally opposed the motion but moved to voluntarily dismiss her two remaining invasion of privacy claims of intrusion upon seclusion and false light portrayal. The parties argued the motion on December 2, 2021. On December 21, the court granted Campanelli's motion for voluntary dismissal of her remaining privacy claims. It

---

[7] Campanelli also sued Rebound Orthopedics and Neurosurgery but does not appeal summary judgment dismissal of that defendant.

[8] The motion for summary judgment is not in the record.

[9] The trial court also awarded PeaceHealth and RN Sathre attorney fees and costs under RCW 4.24.510.

also granted the defendants' motion for summary judgment dismissal of Campanelli's claims against RN Sathre for medical negligence under chapter 7.70 RCW and against PeaceHealth for common law negligence.

After oral argument but before the trial court issued its December 21 ruling, Campanelli moved to amend her complaint against PeaceHealth and RN Sathre. She sought to include in her negligence claim against PeaceHealth that RN Bob failed to protect her and to add new claims for breach of fiduciary duty and loss of marital consortium. She also sought to add a new privacy claim based on RN Sathre's communications with reporter Harshman. On January 19, 2022, the trial court granted the motion to amend.

On January 21, 2022, Campanelli amended her complaint against PeaceHealth and RN Sathre, alleging invasion of privacy for disclosing private facts to Harshman, breach of fiduciary duty, and loss of marital consortium on behalf of her husband, Keith. She also alleged medical negligence under chapter 7.70 RCW against only PeaceHealth.

Campanelli also moved to consolidate her two complaints against Dr. Musleh, PeaceHealth, and RN Sathre. On January 26, 2022, the trial court granted her motion. Campanelli amended her complaint a final time in May 2022 to argue RN Bob's breach of the duty of care contributed to PeaceHealth's medical negligence.

After consolidation, Dr. Musleh moved for summary judgment dismissal in September 2022, arguing Campanelli proffered no expert testimony to establish the relevant medical standard of care. Campanelli responded with a declaration from neurosurgeon Stephen Bloomfield. Dr. Bloomfield opined on the standard

8

of care and concluded that Dr. Musleh violated that standard by deviating from PeaceHealth's policies and procedures prohibiting patients from self-medicating. He also concluded that Dr. Musleh proximately caused Campanelli's overdose. In reply, Dr. Musleh challenged Dr. Bloomfield's qualifications to render a medical opinion in Washington because his declaration did not show his familiarity with Washington's standard of care for neurosurgeons. He also challenged the sufficiency of Dr. Bloomfield's declaration, arguing it failed to support the elements of a medical malpractice claim.

On November 15, 2022, the trial court granted summary judgment and dismissed Campanelli's claims against Dr. Musleh.[10] That same day, PeaceHealth and RN Sathre moved for summary judgment dismissal of Campanelli's remaining claims with prejudice. The trial court granted the motion.

Campanelli appeals.

### ANALYSIS

Campanelli argues the trial court erred by dismissing her medical malpractice claims against Dr. Musleh and PeaceHealth and her privacy claims against RN Sathre.[11] We address each argument in turn.

We review a trial court's grant of summary judgment de novo. *McDevitt v. Harborview Med. Ctr.*, 179 Wn.2d 59, 64, 316 P.3d 469 (2013). Summary judgment is appropriate only when "there is no genuine issue as to any material

---

[10] Campanelli moved for reconsideration, which the trial court denied.

[11] Campanelli argues for the first time in her reply brief that she also intended to appeal the trial court's order dismissing her medical malpractice claim against RN Sathre. But we will not consider issues raised and argued for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

A defendant moving for summary judgment can challenge whether the plaintiff produced competent evidence to support the essential elements of their claim. *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285 (2019). The plaintiff must then provide sufficient evidence to support those elements. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The plaintiff may not rely on the allegations in their pleadings. *Id.* at 225-26. Instead, the plaintiff must respond with evidence setting forth specific facts to show that there is a genuine issue for trial. *Id.* We consider all facts submitted and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party. *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000).

1. Medical Malpractice Claims

RCW 7.70.040 governs a medical malpractice claim. *Harris v. Robert C. Groth, M.D., Inc.*, 99 Wn.2d 438, 443-44, 663 P.2d 113 (1983). Under former RCW 7.70.040(1) (2011),[12] a plaintiff alleging medical malpractice must show that the health care provider has

> failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances.

The plaintiff must also show that "[s]uch failure was a proximate cause of the injury complained of." Former RCW 7.70.040(2).

---

[12] The legislature amended RCW 7.70.040 in 2021 to include COVID-19 and state of emergency protocols. LAWS OF 2021, ch. 241, § 2.

A plaintiff must generally support each element of their medical malpractice claim with qualified expert testimony. *Harris*, 99 Wn.2d at 449. We review de novo whether sufficient evidence qualifies an expert's opinion. *Hill v. Sacred Heart Med. Ctr.*, 143 Wn. App. 438, 445-46, 177 P.3d 1152 (2008).

Under ER 702, an expert's opinion can be qualified by "knowledge, skill, experience, training, or education." Whether an expert is qualified to render an opinion is a preliminary finding by the court under ER 104(a). *Chervilova v. Overlake Obstetricians & Gynecologists, PC*, 30 Wn. App. 2d 120, 125, 543 P.3d 904 (2024). An expert's opinion must be based on more than conjecture or speculation. *Id.* "On summary judgment, this is a burden of production, not persuasion." *Id.*

### a. Medical Malpractice Claim against Dr. Musleh

Campanelli argues that the trial court erred by dismissing her lawsuit against Dr. Musleh because her expert, Dr. Bloomfield, sufficiently supported all essential elements of her medical malpractice claim in his declaration. Dr. Musleh argues Dr. Bloomfield is unqualified to render an opinion on her claim because he did not establish that he is familiar with the Washington standard of care for neurosurgeons. And, even if Dr. Bloomfield is qualified to render an opinion on Washington's standard of care, he fails to show that Dr. Musleh breached the standard or that any breach proximately caused Campanelli's injuries. We agree with Campanelli.

### i. Qualification

To determine whether an expert is qualified to render an opinion on medical malpractice, we generally examine the record to determine the expert's

specialty and whether the expert and the defendant practice in the same field. *Boyer*, 10 Wn. App. 2d at 521. But if an expert does not practice in the state of Washington, we must separately determine whether the expert is familiar with Washington's standard of care. *Id.* An out-of-state expert may establish familiarity with the Washington standard of care through admissible testimony that a national standard of care exists and that Washington follows the national standard. *Id.*; *Driggs v. Howlett*, 193 Wn. App. 875, 899, 371 P.3d 61 (2016).

Here, Dr. Bloomfield declared that he is a neurosurgeon at JFK hospital in New Jersey and an associate professor of neurosurgery at Seton Hall University. He attended Rutgers New Jersey Medical School and received fellowship training in neurochemistry and neurology from the National Institutes of Health, University of California Los Angeles, and University of California Irvine. Dr. Bloomfield is licensed by the National Board of Medical Examiners to practice medicine in New Jersey and Pennsylvania, and he was previously licensed in Arizona, California, and West Virginia. He has also been certified by the American Board of Neurological Surgery and is in the process of recertification. Before becoming a professor at Seton Hall, Dr. Bloomfield taught at the University of California Irvine Medical Center and West Virginia University School of Medicine.

From this evidence, we can determine that Dr. Bloomfield is a licensed medical doctor practicing the same specialty as Dr. Musleh—neurosurgery.

Dr. Bloomfield also declared that Dr. Musleh "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent neurosurgeon acting in the same or similar circumstances in the United States including the state of Washington." Specifically, he violated PeaceHealth's "written policies and

procedures which prohibit patients from self-medicating in the hospital with their own medications brought from home."  Viewing this statement and all inferences from it in a light most favorable to Campanelli, we can discern that in Dr. Bloomfield's opinion, Dr. Musleh's actions fell short of the standard of care that applies "in the United States," which necessarily includes the standard of care in Washington.

Dr. Musleh argues that Division Three's conclusion in *Boyer* compels a different result.  In that case, the plaintiff sued Dr. Kai Morimoto for medical malpractice arising from cosmetic surgery.  *Boyer*, 10 Wn. App. 2d at 512.  Dr. Morimoto moved for summary judgment, arguing that the plaintiff provided no expert testimony that he violated the standard of care for plastic surgeons in Washington.  *Id.*  The plaintiff then submitted a declaration from Dr. John Shamoun.  *Id.* at 513.  In his declaration, Dr. Shamoun stated that the standard of care for plastic surgeons is " 'not unique to the State of Washington and applies on a nationwide basis.' "  *Id.*  And he concluded that Dr. Morimoto violated the nationwide standard of care.  *Id.*  Still, the trial court granted Dr. Morimoto's motion for summary for judgment.  *Id.* at 517.

On appeal, Division Three held that the trial court properly rejected Dr. Shamoun's expert declaration.  *Boyer*, 10 Wn. App. 2d at 518.  It concluded that the declaration "did not qualify him to testify to the standard of care in Washington State" because he "failed to disclose how he knew Washington's standard to equate to a national standard."  *Id.* at 524.  Division Three held that Dr. Shamoun's testimony amounted to speculation because an "expert must

13

provide some underlying support for his opinion that the state standard follows the national standard." *Id.*

After Division Three decided *Boyer*, we addressed the same issue in *Chervilova*. In that case, we acknowledged that an out-of-state medical professional must show familiarity with the Washington standard of care to qualify as a medical expert in Washington. *Chervilova*, 30 Wn. App. 2d at 126. But we concluded that the expert in *Chervilova* adequately showed how he knew Washington followed the national standard of care. *Id.* at 126-27. First, we pointed out that such a showing is a preliminary issue of fact determined under a burden of production, not persuasion. *Id.* at 125. And, in the context of summary judgment, we must view evidence offered in support of the preliminary finding of fact and any inferences therefrom in a light most favorable to the nonmoving party. *Id.* We then determined that testimony from a medical professional that "based on his training, education, and experience," he knows that Washington follows the national standard of care, adequately shows that the expert was familiar with Washington's standard of care and qualified to render a medical opinion in Washington. *Id.* at 127, 130.

We reach the same conclusion here. There are no magic words that a medical professional must utter to show familiarity with the Washington standard of care. A witness need only opine on the standard and show that they are qualified to render their opinion by knowledge, skill, experience, training, or education. ER 702. Here, Dr. Bloomfield opined that Washington neurosurgeons follow the national standard of care. And, viewing Dr. Bloomfield's testimony in a light most favorable to Campanelli, we can infer that like the expert in *Chervilova*,

he knows that the standard of care for neurosurgeons in Washington is the same as the national standard of care through his extensive training, education, and experience detailed in his declaration. As a result, Campanelli satisfies her burden of production at summary judgment.[13]

### ii. Breach

To prevail on a medical malpractice claim, a plaintiff must show that a medical provider breached the applicable standard of care. *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86-87, 419 P.3d 819 (2018); former RCW 7.70.040. Specifically, the plaintiff must provide expert testimony about "how the defendant acted negligently" by breaching the standard of care and must link that conclusion to a factual basis. *Reyes*, 191 Wn.2d at 86-87.

Dr. Bloomfield declared that he reviewed Campanelli's medical records and other documents in her case and, based on his training, education, and experience, concluded that Dr. Musleh violated PeaceHealth's written policies and procedures prohibiting patients from "self-medicating in the hospital with their own medications brought from home." He opined that

> by allowing [Campanelli] to possess and consume unknown quantities of Nucynta, Dr. Musleh failed to exercise that degree of care, skill, and learning expected of a reasonably prudent neurosurgeon acting in the same or similar circumstances in the United States including the state of Washington.

Dr. Musleh argues that Dr. Bloomfield's testimony fails to articulate a specific standard of care and does not create an issue of material fact. But Dr.

---

[13] We note that because the burden at summary judgment is a preliminary showing, Dr. Musleh will have the opportunity to challenge Dr. Bloomfield's knowledge of Washington's standard of care for neurosurgeons and to present his own expert testimony on the issue at trial.

Bloomfield identified the standard of care as "that degree of care, skill, and learning expected of a reasonably prudent neurosurgeon acting in the same or similar circumstances." And he declared that failure to follow hospital policies prohibiting patients from self-medicating violates that standard. While Dr. Musleh claims he instructed Campanelli not to self-medicate, Campanelli says that she told Dr. Musleh she was taking her own Nucynta, and he took no action to discourage her or secure the medication. That competing testimony creates a genuine issue of material fact as to breach.

### iii. Proximate Cause

Dr. Musleh next argues that even if Campanelli established that he breached Washington's standard of care, she fails to show that his breach was a proximate cause of her harm. Again, we disagree.

To establish causation, the plaintiff must show that the alleged breach of the standard of care was a proximate cause of the claimed injury. Former RCW 7.70.040(2). Proximate cause has two elements: cause in fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985).[14]

Cause in fact refers to the actual "but for" cause of the injury; that is, but for the defendant's actions, the plaintiff would not be injured. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). Establishing cause in fact involves a determination of what actually occurred and is generally left to the jury to decide. *Id.* On the other hand, legal causation is "grounded in policy

---

[14] *But see Zorchenko v. City of Federal Way*, 31 Wn. App. 2d 390, 401-04, 549 P.3d 743 (2024) (Feldman, J., concurring) (explaining that cause in fact and legal causation are separate and distinct elements of a negligence claim rather than elements of proximate cause).

determinations as to how far the consequences of a defendant's acts should extend." *Crowe v. Gaston*, 134 Wn.2d 509, 518, 951 P.2d 1118 (1998). "In deciding whether a defendant's breach of duty is too remote or insubstantial to trigger liability as a matter of legal cause, we evaluate 'mixed considerations of logic, common sense, justice, policy, and precedent.' " *Lowman v. Wilbur*, 178 Wn.2d 165, 169, 309 P.3d 387 (2013)[15] (quoting *Hartley,* 103 Wn.2d at 779).

Dr. Musleh argues that Dr. Bloomfield's declaration does not establish cause in fact because he fails to show that Campanelli would have surrendered her medication even if Dr. Musleh had requested her to. But Dr. Bloomfield opined that but for Dr. Musleh's failure to follow hospital policy, Campanelli would not have possessed the Nucynta to consume and would not have suffered an injury. Whether Campanelli would have complied with Dr. Musleh's efforts is, again, a question of fact for the jury to decide.

Next, citing *Arsnow v. Red Top Cab Co.*, 159 Wash. 137, 292 P.436 (1930), and *Orcutt v. Spokane County*, 58 Wn.2d 846, 364 P.2d 1102 (1961), Dr. Musleh argues that Campanelli cannot show legal causation. He contends that Campanelli's overdose was an act of self-harm that amounts to an independent, intervening act breaking the chain of causation.[16]

In *Arsnow*, a taxicab struck and severely injured Harvey Arsnow. *Arsnow*, 159 Wash. at 138. Shortly after a jury declared a mistrial in his personal injury

---

[15] Internal quotation marks omitted.

[16] While Dr. Musleh's argument touches on duty and intervening causation, we discuss it under the heading of legal causation consistent with how he presents the issue in his brief.

lawsuit against the cab company, Arsnow committed suicide. *Id.* His widow then sued the company, alleging the collision injured Arsnow's brain such that he became "insane" and, as a result, committed suicide. *Id.* at 138-39. Our Supreme Court established that the rule of proximate cause in cases of suicide is that

> liability may exist on the part of a person . . . where the death of the person injured results from [their] own act committed in delirium or frenzy and without consciousness or appreciation on [their] part of the fact that such act will in all reasonable probability result in [their] death, or when the act causing the death is the result of an uncontrollable impulse resulting from a mental condition caused by the injuries.

*Id.* at 156. And it concluded that as a matter of law, Arsnow's death was not the "proximate result of the injuries which he suffered at the time of the collision with defendant's taxicab" because there was no evidence presented that the act occurred in delirium, "frenzy," or as a result of an uncontrollable impulse caused by the injuries. *Id.* at 161-62.

In *Orcutt*, the decedent's estate sued Spokane County for negligence after the decedent committed suicide more than a year after she was injured in an automobile accident caused by a washed out road in Spokane County. 58 Wn.2d at 847-49. At the close of the plaintiff's case, the trial court granted the defendant's motion to dismiss. *Id.* at 847-48. Our Supreme Court upheld the rule from *Arsnow* but concluded that the trial court erred in holding there was insufficient evidence for the jury to decide whether the injuries from the accident caused the decedent to act from an uncontrollable impulse to harm herself. *Id.* at 857.

18

Arsnow and Orcutt establish that a person has no common law duty to avoid acts or omissions that lead to self-inflicted harm unless those acts or omissions cause injuries that lead a plaintiff to experience delirium, frenzy, or uncontrollable impulses. But Campanelli did not sue Dr. Musleh for common law negligence. Instead, she sued Dr. Musleh for medical malpractice, a statutory cause of action. She alleged that Dr. Musleh breached his statutory duty as a neurosurgeon to comply with Washington's standard of care. And, as discussed above, that duty required Dr. Musleh to "exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider . . . acting in the same or similar circumstances." Former RCW 7.70.040(1).

Whether Campanelli's attempt at self-harm was a foreseeable consequence arising from Dr. Musleh's breach of his duty as a reasonably prudent health care provider is a different question than whether self-harm is foreseeable from the breach of a common law duty to avoid negligent conduct. Whether Dr. Musleh breached his statutory duty and whether Campanelli's attempt at self-harm was a foreseeable consequence of that breach are issues for the trier of fact.

b. Medical Malpractice Claim against PeaceHealth and RN Bob

Campanelli argues the trial court erred by dismissing her medical malpractice claim against PeaceHealth based on RN Bob's negligence. PeaceHealth argues that Campanelli's expert, an advanced registered nurse practitioner (ARNP), fails to show that RN Bob violated the applicable standard of

care or that any breach proximately caused Campanelli's injuries.[17]  We agree with Campanelli.

### i. Standard of Care

As discussed above, expert testimony is generally necessary to establish the standard of care in a medical malpractice claim.  *Young*, 112 Wn.2d at 228. And the expert must have "sufficient expertise in the relevant specialty" such that the expert is familiar with the procedure or medical problem at issue.  *Id.* at 229. And, again, an expert can establish their expertise though their "knowledge, skill, experience, training, or education."  ER 702.

Campanelli alleges that RN Bob violated the standard of care because he did not follow appropriate procedures for securing her Nucynta.  In support of her allegations, she offered the declaration of ARNP Karen Wilkinson.  ARNP Wilkinson testified that she has bachelor's and master's degrees in nursing.  She is a licensed RN, a licensed ARNP, and a certified pediatric nurse practitioner. She has taken several courses on standards of care, laws, and regulations for nursing and taught nursing curriculum covering adult and pediatric patients.  She says she "was taught as far back as Nursing School that patients should never be allowed to self-administer their own medication with no special notice, supervision and control."  ARNP Wilkinson further declares that PeaceHealth's policy prohibiting patients from self-medicating "at their discretion with no

---

[17] PeaceHealth also alleges that Campanelli's ARNP expert does not have the necessary training and experience to establish RN Bob violated the standard of care because she is a pediatric nurse and unfamiliar with the standard of care for adult patients in a postsurgical setting.  But PeaceHealth offers no expert testimony or other explanation showing why the standard of care addressing this procedure differs for adults and children.

supervision or control is the universal standard in effect in hospitals throughout Washington and the United States." And that these hospital policies "are mandatory standards designed to protect the patient from serious risk of death or injury from overdose."

Viewed in a light most favorable to Campanelli, ANRP Wilkinson's declaration shows that she is qualified to render an opinion on the nursing standard of care related to patients self-administering their own medication, as well as compliance with hospital policies.

### ii. Breach and Proximate Cause

PeaceHealth argues that ANRP Wilkinson's declaration fails to show that RN Bob breached his standard of care or that the breach was a proximate cause of Campanelli's harm. We disagree.

As discussed above, a plaintiff must show through expert testimony that a medical provider breached their standard of care, and that the alleged breach was a proximate cause of the injury complained of. Former RCW 7.70.040; *see Harris*, 99 Wn.2d at 449.

Here, ARNP Wilkinson opines that RN Bob's

> failure to immediately intervene and inspect and remove the Nucynta violated the acceptable standard of care of an RN meaning that he failed to exercise that degree of skill, care and learning expected of a reasonably prudent RN in Washington acting at the time in the same or similar circumstances. RN Bob violated the [PeaceHealth] medication policy and procedure which prohibited patients from self-administering their own medication from home. This violation is evidence of RN Bob's breach of the standard of care meaning he failed to exercise that degree of care, skill and learning expected of a reasonably prudent RN acting at the time in Washington in the same or similar circumstances.

PeaceHealth argues that ARNP Wilkinson's testimony about breach is broad and mischaracterizes the evidence. According to PeaceHealth, her opinion turns on the assumption that Campanelli told RN Bob that she brought medications from home, but the evidence shows that he only "went to give [Campanelli] her morning medications" and withheld them because Campanelli said "she took her morning medicines." PeaceHealth ignores Campanelli's declaration in which she claims that she told RN Bob she was "taking [her] own prescription pain medication" that she brought from home. Campanelli's declaration creates a genuine issue of material fact as to breach.

As to causation, ARNP Wilkinson declared that PeaceHealth's medication policies "are mandatory standards designed to protect the patient from serious risk of death or injury from overdose." She said that RN Bob "allowed Campanelli to self-administer an unknown quantity of her own opiate pain medication from home in lieu of the oxycodone and gabapentin he previously ordered." And that this breach of the RN standard of care "was at least one proximate cause of Campanelli's overdose and injury, on a more probable than not basis, to a reasonable degree of nursing certainty." This testimony is sufficient to support that the alleged breach caused the injury.

We conclude that Campanelli supported her claim with qualified expert testimony that RN Bob breached the applicable standard of care and that the breach was a proximate cause of Campanelli's injury.

2. Privacy Claims

Campanelli argues the trial court erred by dismissing her privacy claims based on RN Sathre's communications with the police and reporter Harshman.[18]

a. RN Sathre's Communication to the Police

RN Sathre argues her communication to police did not violate any privacy obligations and, even if it did, she is immune from liability under Washington's anti-SLAPP statute. We agree.

Under Washington's anti-SLAPP statute,

> [a] person who communicates a complaint or information to any branch or agency of federal, state, or local government . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization.

RCW 4.24.510. The purpose of the statute is to "protect citizens who come forward with information that will help make law enforcement and government more efficient and more effective." *K.M.P. v. Big Bro. Big Sisters of Puget Sound*, 16 Wn. App. 2d 475, 481, 480, 483 P.3d 119 (2021) (holding a minor immune from liability under anti-SLAPP after they reported abuse to an adult, who reported the abuse to the police). For this reason, Washington's anti-SLAPP immunity is intentionally broad. *See Leishman v. Ogden Murphy Wallace, PLLC*, 196 Wn.2d 898, 908, 479 P.3d 688 (2021). Anti-SLAPP "tolerates some degree of overinclusiveness" because "any person who communicates information

---

[18] Campanelli separately claims that RN Sathre violated the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 201. But HIPAA does not expressly create a private cause of action to enforce a violation. *O'Donnell v. Blue Cross Blue Shield of Wyo.*, 173 F. Supp. 2d 1176, 1179 (D. Wyo. 2001). The United States Secretary of Health and Human Services, not private individuals, pursues actions against alleged offenders of HIPAA. *Id.* at 1179-80.

reasonably of concern to the government must be immune to suit based on the communication." *Id.*

Here, RN Sathre reported to the Vancouver Police Department that Campanelli assaulted her. Her communication was a matter of reasonable concern to the police—the reporting of a possible crime. And the communication contained information related to the alleged crime. RN Sathre explained to Officer Materne her version of events, including that the hospital had restrained Campanelli because she had harmed herself by taking extra pain medication without approval. And she told the officer that Campanelli was not severely mentally ill and kicked her on purpose. While RN Sathre's report arguably touched on Campanelli's personal health information, it was relevant to the events surrounding the alleged crime, so the anti-SLAPP statute shields her from resulting liability.

Still, Campanelli argues that RN Sathre waived her right to immunity under the anti-SLAPP statute. She cites several out-of-state cases in which parties contractually agreed to give up anti-SLAPP protections. *See, e.g.*, *Middle-Snake-Tamarac Rivers Watershed Dist. v. Strengrim*, 784 N.W.2d 834, 842 (Minn. 2010) (noting that Minnesota's anti-SLAPP law may not provide presumptive immunity to parties who have contractually waived it). But Campanelli offers no evidence that RN Sathre contractually agreed to waive her anti-SLAPP protections.

The trial court did not err by dismissing Campanelli's privacy claims related to RN Sathre's communication with the police.[19]

---

[19] Because we find that the trial court properly applied the anti-SLAPP statute, we affirm its order awarding statutory attorney fees to PeaceHealth and RN Sathre.

    b.  <u>RN Sathre's Communication to Reporter Harshman</u>

Campanelli argues that RN Sathre invaded Campanelli's privacy by publicly disclosing private facts when she told Harshman the police incident number that identified Campanelli by name.  We disagree.

Washington law recognizes a common law claim for invasion of privacy based on public disclosure of private facts.  *See Reid v. Pierce County*, 136 Wn.2d 195, 204-05, 961 P.2d 333 (1998) (citing RESTATEMENT (SECOND) OF TORTS § 652D (AM. L. INST. 1977)).  A person is subject to liability if they " 'give[ ] publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.' "  *Id.* at 205 (quoting RESTATEMENT (SECOND) OF TORTS § 652D).

To prevail, a plaintiff must show that the defendant gave publicity to a matter of private concern.  *Reid*, 136 Wn.2d at 205.  Publicity requires "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  RESTATEMENT (SECOND) OF TORTS 652D, cmt. a.  Something is a matter of private concern if it concerns the "intimate details of one's personal and private life."  *Spokane Police Guild v. Wash. State Liquor Control Bd.,* 112 Wn.2d 30, 38, 769 P.2d 283 (1989).

Here, RN Sathre did not tell Harshman intimate details of Campanelli's personal or private life.  She described to Harshman the details of Campanelli's assault but did not identify Campanelli by name.  And Campanelli fails to show that an incident number to a publicly available police report amounts to an

25

intimate detail of one's personal or private life, even if that public information contains personal identifying information. As a result, the trial court did not err by dismissing the privacy claims.[20]

In sum, Campanelli adequately supported the elements of her medical malpractice claims against Dr. Musleh and PeaceHealth, and the trial court erred by dismissing those claims on summary judgment. But the court properly granted summary judgment for RN Sathre. We affirm the dismissal of Campanelli's privacy claims but remand her medical malpractice claims for further proceedings.

Brunner, J.

WE CONCUR:

Feldman, J.

Hazelrigg, A.C.J.

---

[20] Campanelli asks for an award of reasonable attorney fees and costs under RCW 70.02.170 for claims based on RN Sathre's disclosure of more information than the " 'minimum necessary' to the police and her disclosures to the newspaper." Because we conclude that RN Sathre did not violate Campanelli's privacy rights, we deny her request.